1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8

9 KEITH SERIALES,                          1:09-cv-00355-BAM (HC)

10                     Petitioner,          ORDER DENYING PETITIONER'S MOTION
                                            FOR STAY AND ABEYANCE AND
11       v.                                 DENYING MOTION TO EXPAND RECORD
                                            TO CONSIDER COPY OF "CD" RECORDING
12
     K. HARRINGTON,                         [Docs. 22, 38]
13
                      Respondent.           ORDER DENYING PETITION FOR WRIT OF
14                                          HABEAS CORPUS, DIRECTING CLERK OF
                                            COURT TO ENTER JUDGMENT IN FAVOR
15                                          OF RESPONDENT, AND DECLINING TO
                                            ISSUE A CERTIFICATE OF APPEALABILITY
16
                                            [Doc. 23]
17

18 _____/

19       Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28

20 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction

21 of the United States Magistrate Judge.  Local Rule 305(b).

22                     BACKGROUND AND STATEMENT OF FACTS[1]

23       Appellant Keith John Seriales stands convicted, following a jury trial, of first
     degree murder with kidnap-murder, foreign object penetration-murder, and
24   murder by torture special circumstances (Pen. Code, [N.1] §§ 187, subd. (a),
     190.2, subd. (a)(17), (18); count 1); torture (§ 206, count 2); kidnapping (§ 207,
25   subd. (a); count 3); sexual penetration with a foreign object, involving torture,
     kidnapping, and tying and binding (§§ 289, subd. (a), 667.61, subds (a), (d) & (e);
26   count 4); sexual penetration with a foreign object while acting in concert,

27 _____

28       [1] The procedural history and statement of facts is taken from the California Court of Appeals, Fifth
     Appellate District's November 1, 2007, which is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).

involving torture, kidnapping, and tying and binding (§§ 264.1, 289, subd. (a), 667.61, subds. (a), (d) & (e); count 5); and sexual penetration with a foreign object of a person under age 18 (§ 289, subd. (h); count 6). [N.2] As to each count, two vicarious arming allegations (§ 12022, subd. (a)(2)), one involving a nine-millimeter handgun and the other an AK-47 assault rifle, were found to be true.  The prosecution sought the death penalty, but jurors determined the appropriate penalty to be life in prison without the possibility of parole. Following denial of his new trial motion, appellant was sentenced to a total unstayed term of life in prison without the possibility of parole plus 20 years.  In this timely appeal, he raises a number of claims of trial and sentencing error.  For the reasons that follow, we will affirm the convictions, but remand the matter for re-sentencing.

[N.1] All statutory references are to the Penal Code unless otherwise stated.

[N.2] Due to a clerical error, the verdict form for count 6 refers to a violation of subdivision (a) of section 289 (citation.)

FACTS

I

DISCOVERY OF THE HOMICIDE AND SUBSEQUENT INVESTIGATION

Somewhere around 11:00 p.m. on January 24, 2001, Virginia Cabrera, who lived in rural Tulare County, heard two cars speed by, and her normally quiet dog started barking.  The next morning, the bound, nude body of 17-year-old Eric Jones was found near Avenue 16 and Highway 43, less than a mile from Cabrera's residence.  Ten 9-millimeter shell casings were located nearby, and five bullets were dug out of the ground underneath the body.  There were bullet holes in Jones's back and a wooden stick protruding from his anus.  Duct tape was wrapped around his face and head, and his hands and feet were taped together behind him.  There were blue markings on his back. [N.3] An autopsy revealed nine entrance wounds to Jones's right back, with eight corresponding exit wounds to the chest.  At least two of the entrance wounds showed evidence of tattooing, indicating very close-range shots.  There was also a single gunshot entrance wound to the right cheek.  Jones's face was bruised and abraded, and many of his teeth were broken or knocked free from their sockets.  There was a superficial puncture wound on Jones's back that could have been made by a pointed blunt object such as a screwdriver or an ice pick.  The skin of bruising extending six to eight inches into the body.  Bruising of the rectum, as well as bruising and hemorrhage to the chest, indicated Jones was alive when the various wounds were inflicted.  No injuries consistent with electrocution were noted; however, depending upon various factors, electrocution could have occurred without leaving physical evidence.  The cause of death was exsanguination due to multiple gunshot wounds to the back.  Death would have occurred within a few minutes.

[N.3] The prosecutor presented much of the evidence concerning the body's condition through photographs, rather than descriptive testimony.

Investigation focused on a group of Jones's acquaintances, who, like Jones, lived in or near Delano: Gerardo (Jerry) Zavala, who resided a few miles outside of town at a place called "the ranch"; appellant, who was 29 years old at the time and drove a white Jaguar; Jorge (George or Coce) Vidal, who was sometimes seen in

appellant's company; 17-year-old Daniel Portugal; Juan Soto; his brother Gerardo Soto, who drove a green Intrepid; and Tyrone Ebaniz, who was then 15 or 16 years old.

Jones and Ebaniz were best friends, and they were together at the home of Antoinette Cota, Ebaniz's sister, the night Jones was murdered.  Jones left alone, on foot, after dark.  Ebaniz's whereabouts were unknown to his family until the next morning, when he returned to his grandmother's house, where he was living.  The police contacted him that day.

The morning Jones's body was found, Vidal, the Sotos, and another person offered to burn the trash from inside the home of Juanita Zavala, a sister of Zavala who lived with him at the ranch.  Juanita Zavala found the offer unusual.  These individuals also had black bags with them.  Patricia Mojica, another sister of Zavala who lived at the ranch with Gerardo Soto, recalled Vidal, the Soto brothers, Portugal, and appellant doing something in the backyard at the ranch around the time Jones's body was discovered.  Around the time Jones was found murdered, Mojia saw the white Jaguar one night when just appellant and Vidal were there.

On January 25, appellant and his wife, Lupe Gonzalez, went to San Diego in the Jaguar and returned the next day.  Gonzalez did not stay at their house on the night of January 26, because appellant called and told her to go to her brother's house.  When she asked why, he would not say, but he seemed a little nervous.

On the evening of January 26, Vidal arrived at the Bakersfield residence of Cecilia Ramirez, whose husband was Vidal's cousin.  Vidal said he had come to visit.  He arrived in a white Jaguar. [N.4] The next day, he left and returned in the same Jaguar.

[N.4] Although Ramirez testified that the man driving the car was not in the courtroom, she previously had identified a photograph of [Petitioner] as that person.

Gerardo Zavala was arrested on January 27, 2001.  There were several 55-gallon burn barrels behind his residence.  On top of one were what appeared to be shoelace eyelets and brown leather that could have been from a belt.

Zavala was the godfather of Jose Jiminez's baby, and the two men also worked together part-time, doing auto painting.  As a result, Jiminez spent time at Zavala's residence.  Between the times Jones was in the news and Zavala's arrest, Jiminez was present in the shed in the back of Zavala's place when he overheard a conversation between appellant, Zavala, and Vidal.  Jiminez did not recall whether either of the Soto brothers was present.  Although he claimed at trial not to remember the conversation, he previously told the district attorney's investigator that he had a clear memory of what happened.  He heard appellant say, "we finally got that nigger[.]  Vidal then responded, "he won't be bothering us anymore[.]" appellant then told the others present that if they said anything different than what he said or told them to say, he was going to "stick a broom handle up their ass[.]" Jiminez told a different investigator that it was Vidal who made the first two remarks.

On January 27, 2001, authorities from Tulare and Kern Counties responded to Juan Soto's residence in Delano.  Mail addressed to Gerardo Soto was found inside the residence, and a Dodge Intrepid registered to him was parked in the

3

garage.  Ebaniz's, Portugal's, and Juan Soto's fingerprints were found on the outside of the car.

Bloodstains and white residue that appeared to be detergent wipings were found on the garage floor.  Shoe tracks were found in the bloodstains, which, DNA analysis showed, belonged to Jones.  Near a washing machine in the garage was a bleach bottle with a pair of scissors inside.  Jones's blood was found on the scissors.  Also found inside the garage was a squeegee head without a handle. Pieces of black electrical tape, that appeared to have been torn from the roll, were found in various locations in the garage.  A piece of duct tape was found on the ground by the washer, and a number of beer cans were found inside the garage and in the side yard of the residence.  Vidal's and Gerardo Soto's fingerprints were found on some of the cans.

That same day, appellant was arrested and subsequently gave a statement to Sergeant Skiles, which is described in more detail, *post*.  When his white Jaguar was searched, newspapers from Fresno and Bakersfield, dated January 26, 2001, were found inside.  On the front page of the Fresno paper was an article about Jones's death.

The day following his arrest, appellant directed Skiles to the location in Bakersfield at which he had last seen Vidal.  Appellant expressed to Skiles that he was afraid.  Vidal was arrested early that morning at Cecilia Ramirez's residence, the location shown to Skiles by appellant.  Vidal subsequently directed Skiles to two 9-millimeter handguns and a loaded SKS rifle. [N.5] One of the handguns was determined to have fired all 10 shell casings recovered from the location where Jones was killed, and was the gun used to kill Jones.

[N.5] An SKS rifle is very similar to an AK-47 assault rifle.

II

APPELLANT'S STATEMENT

The tape recording of the statement appellant gave to Sergeant Skiles was played for the jury. [N.6] In it, appellant related that he was acquainted with Jones, who had come by one day about a month earlier to try to sell him a nine-millimeter pistol. Appellant believed Jones had stolen the weapon, as someone called "Crispie" subsequently tried to take it back from appellant. Crispie brought Jones to appellant's house, as Jones apparently had tried to say that appellant had taken the gun from him. When Crispie put a gun to Jones's head, appellant returned the weapon. Appellant lost the $150 he had paid for it. Appellant denied that Jones had ever stolen anything from him personally, although he had heard that Jones and a couple of guys were going to try to rob him or something. Appellant never confronted Jones about these rumors, and nothing ever happened.

[N.6] Appellant professed to know only first names or nicknames and, in the case of Daniel Portugal, simply referred to a dark-complected male with thick eyebrows. For the sake of clarity, we have inserted the actual names, wherever possible, as established by other evidence presented at trial.

With respect to the homicide, appellant was at home when Gerardo Soto telephoned around 7:00 or 7:30 p.m. Gerardo Soto said Jones was there and to bring Vidal. Appellant did not know why "[t]hey" wanted him to bring Vidal over, but he thought Jones had tried to steal Vidal's car or something. They did not

4

tell appellant what they were going to do until he got there and saw everything. He knew they were going to confront Jones, but "just figured we're just gonna beat him up and let him go."

Vidal was already at appellant's house. The two men were "pretty close," with Vidal being someone who thought that if he hung around with appellant, he could get rich. [N.7] They first went to the ranch to pick up Zavala. Gerardo Soto had not said to bring him; it was Vidal's idea to do so. When Zavala was not home, appellant and Vidal went to Juan Soto's house.

[N.7] Appellant admitted being a drug dealer.

Upon their arrival, appellant and Vidal went into the house and then on into the garage. Gerardo and Juan Soto, Zavala, Portugal, and Ebaniz were there. Portugal was walking around with an AK-47. Jones was already tied up, and everyone except Ebaniz was beating and kicking him. Ebaniz was just watching. Gerardo Soto and Zavala told appellant that Ebaniz had brought Jones there, and had set him up by making a call to get him to come. Neither appellant nor Vidal had known Ebaniz was going to do that, but Vidal "got a hardon" when he saw Jones lying there.

Within a couple minutes of appellant's arrival, Vidal struck Ebaniz, whom appellant told not to worry. He and Zavala took the youngster into the house. Appellant stayed in the house a lot, talking to Ebaniz and telling him to "just kick back." Juan Soto also mostly stayed in the house, as he was scared. Appellant went back and forth between the house and the garage, as sometimes Vidal called to him. Sometimes Gerardo Soto had the AK-47, and other times Portugal had it. Both pointed it at Jones's head while they were kicking him. Vidal was hitting Jones with his fist and accusing him of trying to steal his car. Jones said that Pepe had brought him to steal Vidal's car. Appellant knew Pepe as someone who started trouble and stole from everyone. He had tried to break into appellant's house.

When appellant went into the garage in response to Vidal's summons, Jones was "[p]retty bad," although he "wasn't that bad" at this time. He was tied up with some orange extension cord. Vidal told appellant and Zavala to go get some black plastic, appellant guessed to do something with Jones. [N.8] Vidal was "crazy that night, he went wacko." Jones was "[b]ad," as he was still being beaten off and on by Portugal and Vidal, although all his clothes were still on. Vidal, who was "psycho," was responsible for making Jones "all swelled up."

[N.8] Appellant laughingly stated that he did not know what Vidal was going to do, "make a burrito out of him or ... wrap his ass up...."

Appellant never went and got the plastic, but instead he and Zavala went to appellant's house. They were there about five minutes, then appellant saw the butcher from Jiminez Market walking by and gave him a ride to his home on the other side of town. After dropping him off, appellant and Zavala returned to the Soto residence. They went into the garage, and appellant announced that he had not gotten the plastic. Jones now had something blue over his head that looked like a pillowcase. He was just lying there, still tied with the extension cord and still clothed. His hands were tied to his feet behind his back. At some point, appellant heard him say that it hurt, and to loosen it.

Appellant remained in the garage for five or 10 minutes. He felt that he was in a position where, if he interfered, he would be shot. Ebaniz was in the garage. Vidal tried to scare him by calling him in to watch what was going on. Jones was still on

the ground. Everyone continued to beat him, off and on, and pointed the gun at him. About this time, they plugged in a wire and shocked him. They used an extension wire that had been cut, and one of them put the wire on Jones's fingers and tortured him. When the wire was plugged in, Jones's body would shake and he would moan. Vidal told Jones that today he was going to die and that he was going to make the papers. Vidal told Ebaniz that Jones was saving his grandmother's life. Appellant assumed he meant he had been going to kill Jones's grandmother if he could not get to Jones. Vidal was trying to scare Ebaniz so that Ebaniz would not say anything. Everyone took turns plugging in the wire. Vidal even made Ebaniz plug it in one time so he would be a part of it. No one did that to appellant.

Appellant took Ebaniz back into the house. Zavala was also there. At some point, Juan Soto was called into the garage and told to go get some beer with Zavala. The two men left. Appellant tried to keep Ebaniz in the house as much as possible, but Vidal kept calling Ebaniz back.

Juan Soto and Zavala were gone for about 30 minutes. During that time, appellant went outside and stood on the front porch for about 10 minutes, to look at his car and make sure nobody messed with it. He went back inside when Zavala and Juan Soto returned with a 24-pack of Bud light cans. They went into the house and then back into the garage, but appellant remained in the living room with Ebaniz.

After about 10 minutes, Vidal called them both back into the garage. The hood was off Jones's head; he looked "all fucked up" and was "all swelled up" and, although he was conscious, his eyes were closed. He was "pretty bad" and seemed to be in a lot of pain. He would moan when they kicked him. Portugal still kicked him a lot, and appellant saw Vidal strike him once on the back with the butt of the AK-47. They were still "talking shit" to him, and Vidal asked him if he wanted an open casket. Vidal was "siked [*sic*] out" and nobody wanted to say anything to him.

Appellant had tape at his house, and they told him to go get it, so he left again. [N.9] When appellant went back into the garage, Portugal and Vidal were removing the extension cord because of fingerprints. Zavala and Juan Soto were inside the house at this point. Vidal told Ebaniz that he wanted to cut off Jones's ear and put it on Pepe's car. They cut off Jones's clothing with a box cutter, then Vidal made Ebaniz start taping Jones's legs. When he was too slow, Portugal took the duct tape away from him and started doing it faster. The whole time, Gerardo Soto was holding the AK-47 on Jones so he would not run.

[N.9] There was some uncertainty about how many times and when, during the course of events, appellant left the Soto residence. When Skiles and appellant were discussing what occurred within a short time after appellant's initial arrival there and Skiles asked how long appellant stayed in the house, appellant replied that *he left a couple of times,* went back home, and then gave the Jiminez Market butcher a ride home. This occurred when Vidal told appellant and Zavala to get some black plastic. When Zavala and appellant returned, Jones was still tied with extension cords and still clothed. Later, when discussing how the extension cords were changed for duct tape, appellant first said they had the tape there, then said no, he had tape at his house and they told him to go get it, so *he left again.* Apparently, however, the audiotape stopped working and was changed, after which Skiles announced that appellant had reminded him that appellant brought back duct tape the first time he left and went home at Vidal's direction, as Vidal had known appellant had a roll of duct tape at his house. Appellant agreed with

6

this statement. Lupe Gonzalez testified that appellant left the house several times that evening. The first time was around 7:00 or 8:00 p.m. Although Chinese food had been ordered for dinner, it had not yet arrived when appellant left. While Gonzalez expected appellant back shortly, she ended up going to bed before he returned. The first time he returned, she heard him in the kitchen and assumed, since she heard dishes, that he was getting himself something to eat. He then left again and returned. This time, he went to bed.

Portugal taped up Jones's legs, then Jones was told to get on his stomach. Jones rolled over on his own, and Portugal taped his hands. Jones's hands were then taped to his feet. The participants were wearing white cotton gloves.

While Jones was on his stomach, Vidal started looking around the garage and found something that looked like a broom stick. He put some kind of motor oil or transmission oil on it, then inserted it in Jones's anus. Jones was moaning. Vidal said, " 'See, you fucked me now I'm fucking you.' " Vidal pushed the stick in and moved it in and out, and he also made Ebaniz do it. Ebaniz, who was afraid, just touched the stick and then threw up and went back inside the house. Portugal and Gerardo Soto remained in the garage, while Vidal, appellant, Ebaniz, and Zavala came inside the house for about 15 minutes. Vidal was doing something with the gun he had and was cleaning the bullets. [N.10] Appellant was in and out, between the house and the garage. When they were about to leave, they taped Jones's mouth and then his eyes, then tried to cover his head with a plastic bag. [N.11] Appellant saw that Jones was gasping for air, so he walked away. When Vidal called to everyone to come on, Portugal and Gerardo Soto threw Jones into the trunk of Gerardo Soto's green car, which was in the garage. Appellant saw that "Pepe's bitch" had been written on Jones's back in blue. Appellant did not see it written, but Vidal was laughing and saying to look at what he had made Ebaniz do.

[N.10] Although this was the first time appellant had seen Vidal with his nine-millimeter that night, appellant was aware Vidal carried the gun all the time. He knew Vidal had the gun when he first took Vidal to the Soto house.

[N.11] Because appellant initially omitted the sexual assault, the chronology of events during this time period is somewhat unclear. Appellant first said Jones's head was taped and then he was left lying, naked, for a while. Everyone but Portugal and Gerardo Soto came inside, and Vidal did something with his gun. Later, however, appellant said the sexual assault occurred before Jones's head was taped up, and that he thought Jones's head was taped when everyone was about to leave. Appellant estimated that he and Vidal arrived at the house at 7:00 p.m., and were there until 10:30 or 11:00 that night.

Appellant went outside, then the garage door opened and Vidal, Gerardo Soto, and Portugal left in Gerardo Soto's green car. Gerardo Soto was driving. They wanted Ebaniz to go with them, but appellant took him instead, along with Zavala. Vidal told appellant to follow them, which he did because he knew Vidal would be angry if he did not.

They proceeded down Highway 43. Appellant momentarily lost the other vehicle when it made a U-turn, but then he saw it parked with its lights off. The trunk was "popped" from inside the car, then Vidal, Gerardo Soto, and Portugal picked Jones up and threw him out on the side of the road. Appellant, Zavala, and Ebaniz remained in appellant's car. Vidal wanted Ebaniz to see what was happening, which was why he made appellant follow him. [N.12] It was very dark, but

appellant heard gunshots and saw Vidal firing. Appellant did not know how many times Vidal fired, but when he saw Vidal afterwards, Vidal said the clip was empty and the gun cocked back. If Vidal emptied the clip, he had to have fired nine or 10 rounds. Vidal said the first bullet he used had a hollow point.

[N.12] When Skiles asked whether Vidal told appellant that he wanted Ebaniz to see it, appellant responded, "Well yeah. He wanted us to stay in the car, you know ... I guess hear the bullet." Skiles again asked, "He told you that?" Appellant responded, "Oh yeah. He wanted him to see that shit." When Skiles then asked when Vidal told appellant that, appellant replied, "He didn't tell me that, but I'm just saying that's what it was. Yeah. So he wouldn't snitch. That's the reason why." Afterwards, everyone drove off. Appellant took Ebaniz to appellant's house, but then Vidal wanted Ebaniz to return to the Soto residence, so appellant took him back. Vidal told Ebaniz that Ebaniz belonged to him now and was going to stay with him, and he later told appellant that he kept Ebaniz for two days.

Vidal was always calling Ebaniz to watch what was going on, to try to scare him. He would say something like he would do it to Ebaniz. The day appellant gave his statement to Skiles, Vidal had told appellant he thought about doing it to Ebaniz. Ebaniz apparently had been picked up for questioning, however, and Vidal said he wanted to find Ebaniz's sister and family so he could come after Ebaniz. Vidal wanted to kill everyone and said he would kill Ebaniz's family in return for Ebaniz snitching on him.

(Ex. A, to Answer, [People v. Seriales, 2007 WL 3208541 (Cal. App. 2007)] at *1-*6.)

DISCUSSION

I.   <u>Motion for Stay and Abeyance</u>

On October 12, 2011, Petitioner filed a motion tor stay and abeyance.  He seeks a stay based on a claim that he recently discovered the California Supreme Court's July 2007 decision in cohort Jorge Vidal's appellate proceedings.  He claims that he was not able to fully present a duress defense at his trial because he was unaware of his cohort Vidal's retardation and mental illness.  Petitioner also contends his equal protection rights were violated based on the fact that cohort Gerardo Zavala was convicted of second degree murder after Petitioner was convicted of first degree murder based allegedly on similar evidence.  Petitioner requests the Court stay and hold the petition in abeyance while he exhausts theses claims in the state courts.

A district court has discretion to stay a petition which it may validly consider on the merits. Rhines v. Weber, 544 U.S. 269, 276 (2005); Calderon v. United States Dist. Court (Taylor), 134 F.3d 981, 987-88 (9th Cir. 1998); Greenawalt v. Stewart, 105 F.3d 1268, 1274 (9th Cir.), cert. denied, 519 U.S. 1102 (1997).  However, the Supreme Court held that this discretion is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

1  <u>Rhines</u>, 544 U.S. at 277. In light of AEDPA's objectives, "stay and abeyance [is] available only

2  in limited circumstances" and "is only appropriate when the district court determines there was

3  good cause for the petitioner's failure to exhaust his claims first in state court." <u>Id</u>. Even if

4  Petitioner were to demonstrate good cause for that failure, "the district court would abuse its

5  discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." <u>Id</u>.

6      In this case, the Court does not find good cause to excuse Petitioner's failure to exhaust

7  either of these claims. Petitioner was convicted by the jury on July 21, 2005. Before Petitioner's

8  case proceeded to judgment, the California Supreme Court held hearings in 2003 and 2004 in

9  Jorge Vidal's case. In a March 15, 2004, order, the state court ruled the death penalty was

10 precluded as to Vidal because he had proved himself to be mentally retarded. <u>People v. Superior</u>

11 <u>Court</u>, 21 Cal.Rptr.3d 542, 547 (Cal.App. 2004) (Vidal I). On December 6, 2004, the California

12 Court of Appeal set aside the Superior Court order. The California Supreme Court granted

13 review and transferred the case back to the California Court of Appeal in light of <u>In re</u>

14 <u>Hawthrone</u>, 35 Cal.4th 40 (2005). <u>See</u> <u>People v. Superior Court</u>, 28 Cal.Rptr.3d 529, 537

15 (Cal.App. 2005) (Vidal II). On May 13, 2005, the California Court of Appeal again reversed the

16 Superior Court. The California Supreme Court granted review again on July 27, 2005. 32

17 Cal.Rptr.3d 4. The following month, Petitioner was sentenced by the Superior Court on August

18 15, 2005.

19     Cohort George Zavala was found guilty of second degree murder, among other things, on

20 October 24, 2006, and was sentenced on November 21, 2006. <u>See</u> <u>People v. Zavala</u>, 168

21 Cal.App.4th 772 (2008).

22     While Petitioner's case proceeded on direct appeal, cohort Vidal's case proceeded to

23 decision, as the California Supreme Court issued a decision on April 12, 2007 affirmed the

24 Superior Court order in part, and remanding to the California Court of Appeal for further

25 proceedings. <u>People v. Superior Court (Vidal)</u>, 40 Cal.4th 999, 1015 (2007) (Vidal III).

26     On November 1, 2007, more than five months later, the California Court of Appeal

27 affirmed Petitioner's conviction on direct appeal.

28

1    On February 23, 2009, Petitioner filed the instant federal petition for writ of habeas

2    corpus. After Respondent's request and notification of a response pending in the California

3    Supreme Court, this Court on January 26, 2010, vacated the current briefing schedule in light of a

4    pending California Supreme Court ruling on the habeas corpus petition.

5    On February 3, 2010, Petitioner filed a first amended petition. On May 18, 2010,

6    Respondent filed an answer. On June 9, 2010, Petitioner filed a traverse.

7    Petitioner has made no showing why ordinary diligence would not have alerted him there

8    was ongoing litigation regarding cohort Vidal during the relevant time frame, i.e. before

9    Petitioner was sentenced, and while his direct appeal pended. Further, the California Supreme

10   Court issued its April 2007 decision in Vidal's case.

11   Nor does Petitioner demonstrate why ordinary diligence would not have alerted him to

12   the fact that cohort Gerardo Zavala was convicted of second degree murder in November 2006,

13   nearly a year prior to Petitioner's conviction being affirmed by the appellate court. Thus,

14   Petitioner has not been diligent but rather dilatory.

15   Under the best case scenario, Petitioner may be seeking a stay under King v. Ryan, 564

16   F.3d 1133 (9th Cir. 2009). In King, a three-step procedure was developed for mixed petition

17   allowing:

18       (1) a petition to amend his petition to delete any unexhausted claims; (2) the court
         in its discretion to stay and hold in abeyance the amended, fully exhausted
19       petition, providing the petitioner the opportunity to proceed to state court to
         exhaust the deleted claims; and (3) once the claims have been exhausted in state
20       court, the petitioner to return to federal court and amends his federal petition to
         include the newly-exhausted claims.

21

22   King, 564 F.3d at 1139.[2]

23   The Court finds that even a stay under King is futile because the claims are untimely. In

24   King, the Ninth Circuit noted that the stay procedure is not a license to sanction "abuse" by

25   litigants. King, 564 F.3d at 1141. Here, Petitioner committed "abuse" by being dilatory in

26   waiting thirty-two months after the instant petition was filed to attempt to even commence

27

28       [2] To preserve any future argument, Respondent objects to the availability of the stay procedure set forth in
         King as inconsistent with the Supreme Court's precedent in Rhines.

10

1  proceedings on these claims, when the time to bring such claims (if ever) was fourteen months

2  (Zavala claim) and nineteen months (Vidal claim) prior to filing the instant petition.  In addition,

3  this case is fully briefed and has been pending a decision on the merits since June 9, 2010.  Thus,

4  even under <u>King</u>, the motion to stay must be denied.

5        Moreover, Petitioner's claims are untimely under AEDPA's claim-based limitation

6  period, 28 U.S.C. § 2244(d)(1)(D).  "Time [under § 2244(d)(1)(D)] begins when the prisoner

7  knows (or through diligence could discover) the important facts, not when the prisoner

8  recognizes their legal significance."  <u>Owens v. Boyd</u>, 234 F.3d 356, 359 (7th Cir. 2000); <u>see also</u>

9  <u>Hasan v. Galaza</u>, 254 F.3d 1150, 1154 n. 3 (9th Cir. 2001).  Petitioner was constructively notified

10  of the California Supreme Court's decision in the Vidal case by the fact it was published in 2007.

11  Petitioner was also constructively notified of the decision in Gerardo Zavala's case by the fact

12  that he was convicted in October 2006 and sentenced in November 2006.  Petitioner does not

13  indicate that he raised any related claims in the state court as of November 2007 and July 2008,

14  and the claims lapsed as of those times.  Thus, irrespective of a stay, the claims could not be

15  presented in this Court.

16  II.   <u>Jurisdiction</u>

17        Relief by way of a petition for writ of habeas corpus extends to a person in custody

18  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

19  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

20  529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

21  guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Tulare County

22  Superior Court, which is located within the jurisdiction this Court.  28 U.S.C. § 2254(a);

23  2241(d).

24        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

25  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

26  enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499

27  (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v. Johnson</u>,

28  97 F.3d

1    751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107(1997).  The instant petition was filed after

2    the enactment of the AEDPA and is therefore governed by its provisions.

3    III.    Standard of Review

4          The instant petition is reviewed under the provisions of the Antiterrorism and Effective

5    Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,

6    70 (2003).  Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

7    barred unless a petitioner can show that the state court's adjudication of his claim:

8          (1) resulted in a decision that was contrary to, or involved an unreasonable application of,
           clearly established Federal law, as determined by the Supreme Court of the United States;
9          or
           (2) resulted in a decision that was based on an unreasonable determination of the facts in
10         light of the evidence presented in the State court proceeding.

11   28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

12   (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

13         As a threshold matter, this Court must "first decide what constitutes 'clearly established

14   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

15   *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

16   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

17   of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

18   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

19   set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

20   the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

21   principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

22   . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

23   review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

24   Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

25   Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

26   end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

27   at 126; Moses, 555 F.3d at 760.

28

1    If the Court determines there is governing clearly established Federal law, the Court must

2    then consider whether the state court's decision was "contrary to, or involved an unreasonable

3    application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28

4    U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

5    the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

6    question of law or if the state court decides a case differently than [the] Court has on a set of

7    materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

8    72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

9    character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third

10   New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

11   [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

12   governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

13   clearly established Supreme Court precedent, the state decision is reviewed under the pre-

14   AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

15   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

16   the state court identifies the correct governing legal principle from [the] Court's decisions but

17   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

18   "[A] federal court may not issue the writ simply because the court concludes in its independent

19   judgment that the relevant state court decision applied clearly established federal law erroneously

20   or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

21   538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

22   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

23   Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

24   correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

25   the Court determines that the state court decision is objectively unreasonable, and the error is not

26   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

27   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

28

1    Petitioner has the burden of establishing that the decision of the state court is contrary to

2 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

3 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

4 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

5 state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

6 Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

7    AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

8 is limited to the record that was before the state court that adjudicated the claim on the merits,"

9 and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

10 Pinholster, 131 S.Ct. 1388, 1398-99.  "Factual determinations by state courts are presumed

11 correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S.

12 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court factual finding is not

13 entitled to deference if the relevant state court record is unavailable for the federal court to

14 review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v. Tamayo-Reyes,

15 504 U.S. 1 (1992).

16 IV.    Miranda Violation/Motion to Introduce Copy of "CD"

17    Petitioner contends the trial court erred by admitting his statement into evidence at trial

18 because he did not unequivocally waive his rights under Miranda v. Arizona, 384 U.S. 436

19 (1966), rendering the statement involuntary.

20    Petitioner has submitted a "CD" recording which he represents is a copy of the reading of

21 his Miranda rights received by his appellate counsel.  Respondent was not served with a copy of

22 the "CD" nor does Respondent have such a copy.  Respondent has submitted an analog recording

23 which he represents was the basis of the state appellate court's finding on the Miranda issue.

24    In Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), the Supreme

25 Court held that in determining the reasonableness of a state court's ruling under § 2254(d)(1),

26 federal courts are "limited to the record that was before the state court that adjudicated the claim

27 on the merits." 131 S.Ct. at 1398.  Thus, for purposes of a § 2254(d)(1) inquiry, "evidence later

28 introduced in federal court is irrelevant." Id. at 1400.  Likewise, based on the plain language in

14

the statute, review under § 2254(d)(2) is limited to "evidence presented in the State court proceeding." Id. at 1400 n. 7.

Petitioner appears to argue that the "CD" recording of the conversation in which his Miranda rights were recorded is superior than that contained on the audio cassette. However, the mere submission of the "CD" recording of the same conversation recorded on audio cassette tape does not change the state of the evidence that was before the state court of which this Court is bound to review. In addition, the clarity of the tape recording was not at issue before the state appellate court and it was played to the jury at trial. Accordingly, this Court is limited to reviewing the state of the evidence that was before the state court and Petitioner's motion must be denied.

In the last reasoned decision, the California Court of Appeal found Petitioner's Miranda claim to without merit, stating:

A. Background

It is undisputed that Sergeant Skiles read appellant his *Miranda* rights, and elicited from appellant that he understood each right, prior to questioning. According to the transcript of the tape-recorded statement, this ensued:

"Det. R. Skiles: Now with those rights in mind do you want to talk to me about this investigation?

"Keith Seriales: *Mmm, I don't know.*

"Det. R. Skiles: It's, it's up to you I can ask you the questions but I need an answer from you before I can ask you anything, I need you to answer. I realize there's more people involved in this deal. We have a lot of evidence here and that's why we're at your house and it's, it's up to if [*sic*] you're gonna take this opportunity or not.

"Keith Seriales: (unintell)

"Det. R. Skiles: (unintell)

"Keith Seriales: There's nothing you can do for me (unintell)

"Det. R. Skiles: Well I, I've told you on the way over here I would, I would make no promises to you, I, I'm not gonna lie to you and the only person that can help you right now is, is you. Uhm I don't, I myself don't know your exact involvement in this case. I mean I, I know part of it but I don't know exactly what you did during the course of these circumstances ...

"Keith Seriales: What, what ...

"Det. R. Skiles: I don't know uhm exactly what caused what happened.

"Keith Seriales: What is uh my involvement (unintell)

"Det. R. Skiles: Well you're gonna have to answer my question before I can talk to you about the case. I'm letting you know what my, my focus of investigation is. But I need to know if you, you want to talk to me about the case. You, you can decide at any time ...

"Keith Seriales: Let me hear, let me hear your question ...

"Det. R. Skiles: You, you can decide at any time if you, if you want to revoke these rights and not answer any questions.

"Keith Seriales: Well let me hear your question (unintell)

"Det. R. Skiles: I have more than one question, I have a lot of questions. That's what I mean, I, I don't know if you understood your Miranda rights. Did you understand them?

"Keith Seriales: Yeah I understand.

"Det. R. Skiles: Okay. If you decide to talk to me, I can question you and you can decide at any time [ ... ]

"Keith Seriales: To stop.

"Det. R. Skiles: To stop or you can decided [ *sic* ] that you didn't want to answer a certain question.

"Keith Seriales: Uh huh.

"Det. R. Skiles: That's up to you.

"Keith Seriales: Uh huh.

"Det. R. Skiles: But I need to know if you're willing to talk to me at this time?

"Keith Seriales: Uh huh.

"Det. R. Skiles: You are?

"Keith Seriales: (unintell)

"Det. R. Skiles: Okay. Uhm my first question is do you know Eric Jones?" (Italics added.)

Appellant answered the question and the interview proceeded.

Prior to trial, appellant moved to suppress his statement on the ground it was taken in violation of his constitutional right to remain silent. Appellant claimed that, while the transcript showed him saying, "Mmm, I don't know," when asked by Skiles if he wanted to talk about the investigation, in reality appellant had given an unequivocally negative response. Appellant further contended that, even

16

assuming his response was equivocal, his rights nonetheless were violated because Skiles's follow-up questions were not limited to clarification of whether appellant was waiving or invoking his Fifth Amendment rights. The People opposed the motion, and an evidentiary hearing was held.

At the hearing, Skiles testified that at 4:45 p.m. on January 27, 2001, he came into contact with appellant when Skiles and other officers were serving a search warrant on appellant's residence in Delano. Appellant was taken into custody and informed of the purpose of the investigation. After several hours, during which time the house was being searched, Skiles transported appellant to the detective bureau of the Delano Police Department for potential questioning. On the way, Skiles told appellant that he could not ask appellant any questions, as that would be a violation of his *Miranda* rights, and that they were going to a location where Skiles could give him that advisement. Skiles wanted to wait until they got to the police station so that he could use an interview room and recording equipment. Once at the police station, Skiles set up an interview room. Only he and appellant were present during the interview, which commenced at 8:19 p.m. Skiles began by having appellant state his name and date of birth, and he noted that he had previously told appellant of the reason for his arrest. Skiles then informed appellant of his rights, using his department-issued *Miranda* card. Appellant indicated that he understood each of his rights.

Skiles next asked if appellant would talk to him. Skiles had reviewed the tape recording of the statement in light of appellant's motion to suppress and, although appellant had not clearly enunciated his words, Skiles had deciphered a mumbled, "'I don't know.'" To Skiles, this meant appellant was unsure whether he wanted to make a statement. Skiles did not believe appellant had either waived or invoked his rights as of that point.

After the pertinent portion of the tape was played for the court, Skiles testified that he subsequently proceeded as he did because he understood appellant to be unsure whether he wanted to talk to Skiles, and Skiles was not going to ask him any questions outside *Miranda* until appellant said whether or not he wanted to talk. When appellant said there was nothing Skiles could do for him, Skiles believed appellant was fishing to see if there was indeed something Skiles could do for him. Skiles had heard words to that effect on numerous occasions; they usually involved a suspect asking for something. Skiles told appellant that the only person who could help appellant right then was appellant, because appellant was indeed the only person who, if he wished to talk, could tell Skiles his involvement. Skiles told appellant that he did not know what appellant's involvement was because he did not know, although he wanted to. Before Skiles started his questioning about the case, he understood appellant to have waived his right to remain silent and to have agreed to talk to Skiles. Had appellant made any gestures indicating no, such as shaking his head, Skiles would not have continued talking to him.

Appellant also testified at the hearing. When Skiles asked whether appellant wanted to talk to him about the investigation, appellant responded, "'Nah'" and then "'huh'" and gave a little shake of his head. During the pause before he answered the question, appellant was thinking about what had happened to him when he gave a statement in his federal case.FN14 When he made his response, his intention was to convey that he did not want to talk. Appellant believed Skiles understood this. Appellant did not say anything like, "I told you I didn't want to talk to you," because Skiles acted as if he did not hear appellant. Appellant conceded that he probably could have made it clearer for Skiles, but he believed Skiles understood.

FN14. Following his arrest in a federal drug case, appellant gave a statement to the FBI and it caused a lot of problems for him and his family. When he made his statement to the FBI, he did not yet have an attorney. Once he had one, the attorney told him never to give a statement. Appellant's arrest in the present case basically removed his opportunity for any deal in the federal case, and he knew Skiles could not give him a deal.

When Skiles mentioned that there were more people involved, that the authorities had a lot of evidence, and that he knew part of appellant's involvement in the case, it piqued appellant's curiosity. Appellant started talking because Skiles made him curious, and he wanted to figure out what Skiles knew.

Following argument, the trial court found an adequate waiver of *Miranda* rights and denied the motion to suppress. The court stated:

"First of all, there's no question that the Miranda rights-there's no issue everybody agrees that Miranda rights were properly given. Now we get to the point now with these rights in mind, do you want to talk to me about this investigation?

"At that point there's a lengthy pause, some seconds, several seconds before there is an answer, which is a generally mumbled answer.

"The People's stenographer says um, I don't know. The officer on the stand said his recollection was something like um, I don't know. The defendant says he said no. And it is in my estimation, I listened to it a number of times, it was not enunciated well. It certainly wasn't clear. If I was an officer, I would not have understood it to be a clear invocation of rights.

"So then the officer then said before I ask you any questions, it's up to you. I can ask you the questions, but I need an answer from you before I can ask you anything. That's the next thing he said.

"The next two pages basically were an attempt as much as by the officer, to clarify whether he wished to talk to him. I see that that [*sic*] this is a clarification based upon either-certainly, I cannot say that there was an unequivocal invocation of the rights. I couldn't hear what was said.

"I believe the officer, that he was not clear that there was an invocation of rights. So once he did get the matter cleared up, he said I need to know whether you want to talk to me. And there was an uh-huh. Affirmative uh-huh."

We summarily denied appellant's ensuing petition for a writ of mandate. (Case No. F048184, June 17, 2005.) As previously described, the tape recording of appellant's statement was played for the jury.

B. *Analysis*

The Fifth Amendment to the United States Constitution guarantees that a suspect in a criminal case "may not be compelled to be a witness against himself in any respect." (*Colorado v. Spring* (1987) 479 U.S. 564, 574.) "To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent. [Citation.] As long as the suspect knowingly and intelligently waives these rights, the police are free to interrogate

him. [Citation.]" (*People v. Stitely* (2005) 35 Cal .4th 514, 535.) The waiver inquiry has two aspects. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude the *Miranda* rights have been waived. [Citations.]" *(Moran v. Burbine* (1986) 475 U.S. 412, 421.)

"Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (*Moran v. Burbine, supra,* 475 U.S. at pp. 422-423, fn. omitted.) If, however, "the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." (*Miranda, supra,* 384 U.S. at pp. 473-474.) "If a suspect's request for counsel or invocation of the right to remain silent is ambiguous, the police may 'continue talking with him for the limited purpose of clarifying whether he is waiving or invoking those rights.' [Citations.]" (*People v. Box* (2000) 23 Cal.4th 1153, 1194.) Statements obtained in violation of these rules are inadmissible to prove guilt. (*People v. Stitely, supra,* 35 Cal.4th at p. 535.) "In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* ..., we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. [Citation.] Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we '"give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 235-236.) The prosecution bears the burden of establishing the voluntariness of a defendant's waiver and confession by a preponderance of the evidence. (*People v. Box, supra,* 23 Cal.4th at pp. 1194-1195; see *Colorado v. Connelly* (1986) 479 U.S. 157, 168.)

We have listened to the tape recording of appellant's statement and are convinced, based both on the discernable words and the inflection of appellant's voice, that he did not say he did not want to talk to Skiles about the investigation, but instead indicated he did not know in response to Skiles's question, "Now with those rights in mind do you want to talk to me about this investigation?" We recognize that "a suspect may indicate that he wishes to invoke [his Fifth Amendment] privilege by means other than an express statement to that effect; no particular form of words or conduct is necessary." (*People v. Randall* (1970) 1 Cal.3d 948, 955, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17.) Thus, "[a]ny words or conduct which 'reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time* ...' [citation] must be held to amount to an invocation of the Fifth Amendment privilege." (*People v. Burton* (1971) 6 Cal.3d 375, 382.) In our view, however, appellant's answer, whether considered alone or in conjunction with his subsequent remark, "There's nothing you can do for me (unintell)," and the pauses between Skiles's questions and appellant's responses, is

19

not reasonably inconsistent with a present willingness to discuss the case freely and completely, nor does it demonstrate an indication by appellant that he wished to remain silent (see *Miranda, supra,* 384 U.S. at pp. 473-474). Instead, it shows uncertainty on his part. Accordingly, Skiles was entitled to attempt to clarify whether appellant was waiving or invoking his rights (*People v. Box*, *supra*, 23 Cal.4th at p. 1194; *People v. Johnson* (1993) 6 Cal.4th 1, 27, disapproved on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826, 879), and we are satisfied he did not exceed the bounds of what is constitutionally permissible.

Appellant relies in large part on *People v. Harris* (1989) 211 Cal.App.3d 640 (*Harris*). In that case, Sergeant Ward advised Harris of his *Miranda* rights and then asked if Harris wanted to talk to him. Harris replied, "'Not really.'" Ward then terminated the interview, turned off the tape recorder, and had Harris indicate "'No'" on the written waiver form. As Ward gathered up his notebook and the tape recorder, he informed Harris that he would be taken across the street and booked for murder. Harris seemed surprised and shocked. Ward then stated, "'"I thought you were going to come back and straighten it out."'" Harris acknowledged that he did want to do this, but Ward responded that he could not talk with Harris anymore because Harris had exercised his rights. Harris, who was 18 years old, said he was scared and wanted to talk to him, but his parents had told him they were going to hire a lawyer and that he should not talk to anyone until that time. Ward left the room, but, uncertain whether Harris was clearly waiving his rights, invoking them, or acting under his parents' orders, he returned and asked Harris if he wanted to change his mind and talk. When Harris responded affirmatively, Ward ascertained that he understood his rights and was expressing his own voluntary decision to talk, and Ward then proceeded to interrogate him. Harris ultimately confessed to helping dispose of the victim's body, then, two days later, to participation in the murder itself. (*Harris, supra,* at pp. 645-646.)

The Court of Appeal held that the initial confession should have been suppressed.FN15 It noted that in *Rhode Island v. Innis* (1980) 446 U.S. 291, the United States Supreme Court concluded "that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis, supra,* at pp. 300-303, fns. omitted; accord, *People v. Boyer* (1989) 48 Cal.3d 247, 273, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal .4th 824, 830, fn. 1.) Examining the interaction between Ward and Harris in light of those principles, the *Harris* court reasoned:

FN15. It also held the second confession was invalid as having been tainted by the first confession. (*Harris, supra,* 211 Cal.App.3d at pp. 649-652.)

"While admittedly a difficult question, we believe the trial court reached the wrong conclusion; just as in *Boyer* there is no evidence here that [Harris] sought to discuss the case further, and we believe Sgt. Ward's comment, 'I thought you were going to come back and straighten it out,' must be deemed the 'functional equivalent' of further questioning. Certainly, Sgt. Ward's comment is understandable, particularly in light of his previous telephone communication with [Harris, in which Harris had said he intended to return to clear up the matter]. But the issue here is whether Sgt. Ward should have known his remark was likely to draw damaging statements from [Harris]. We think it is reasonably foreseeable

that a suspect would react to Ward's statement as a prodding invitation to further discussion about the incident.... Had Ward scrupulously respected [Harris's] right to remain silent, he would not have encouraged further conversation about the murder. This same reasoning compels us to disagree with the trial court's conclusion that [Harris] freely and voluntarily *initiated* the second interview, one minute after he unequivocally stated he did not want to talk.

"The People argue that Sgt. Ward's statement was a proper attempt to clarify whether [Harris] intended to waive his constitutional rights. [Citation.] But here there was nothing ambiguous about [Harris's] *initial* assertion of his right to remain silent. Thus, there was nothing for Sgt. Ward to clarify.... That Sgt. Ward himself was convinced [Harris] had invoked his right to remain silent is evident by his own actions: (1) he terminated the interview when [Harris] indicated he did 'not really' want to talk, and (2) he then had [Harris] sign 'No' next to the appropriate box on the admonishment form. [Harris's] equivocation came later in response to Ward's *subsequent* invitation, a prod that can only be viewed under the circumstances as reasonably likely to chip away at [Harris's] resolve to remain silent and thereby to dishonor his Fifth Amendment privilege against compulsory self-incrimination." (*Harris, supra,* 211 Cal.App.3d at pp. 648-649.)

*People v. Peracchi* (2001) 86 Cal.App.4th 353 (*Peracchi*), which appellant also cites, is similar. In that case, Peracchi was read his rights and stated that he understood them. When asked whether, having those rights in mind, he wanted to talk about the charges on which he was being arrested, he replied that he did not think so and did not think he could talk at that point. When asked why, he stated that he felt his mind was not clear enough right then, and that it was not a good time. The officer asked the reason, whereupon Peracchi said he guessed he did not want to discuss it right then. When the officer asked what he wanted, Peracchi replied, """I don't want to discuss it right now."'" [T]he officer asked whether it was because Peracchi was too tired; Peracchi gave a negative response and began to talk about the incident. (*Id.* at pp. 358-359.)

On appeal, we held that the trial court erred in concluding Peracchi's statement was voluntarily made. We explained:

"After being read his *Miranda* rights and asked whether he was willing to waive them, Peracchi stated he did not think he could talk at that moment. Although his initial statements to the officer regarding whether he was willing to waive his rights may have been ambiguous ..., his intent to remain silent became clear through further questioning. Ultimately, Peracchi stated, 'I don't want to discuss it right now,' clearly indicating that he intended to invoke his right to remain silent. Indeed, the officer's questions assumed that [Peracchi] did not wish to speak with them then and the questions focused solely on the reason why he did not want to do so. Unlike the cases respondent relied upon, the questions here were not directed at whether Peracchi was invoking his right to silence nor were they clarifying whether he understood his rights. Instead, the questions asked why he did not wish to waive his rights. This inquiry itself assumes that Peracchi had invoked his right to remain silent. Officers have no legitimate need or reason to inquire into the reasons why a suspect wishes to remain silent. [¶] ... [¶]

"In *Michigan v. Mosley* [ (1975) ] 423 U.S. 96, the United States Supreme Court ... held that the admissibility of a statement made by a suspect after that person invoked his or her right to silence depended upon whether the right to cut off questioning was 'scrupulously honored.' One can hardly contend that Peracchi's right to remain silent was scrupulously honored. Despite Peracchi's invocation of his right to remain silent, the officer persisted in asking him questions regarding why he did not wish to speak with the officers at that time without even a

1    momentary cessation in questioning. It was only after this repeated questioning
     that Peracchi eventually decided to give the officer a shortened version of the
2    events. Because Peracchi had already invoked his right to remain silent, and the
     officer refused to scrupulously honor that request, Peracchi's statements should
3    have been suppressed." (*Peracchi, supra,* 86 Cal.App.4th at pp. 361-362, fns.
     omitted.)
4
     Neither *Harris* nor *Peracchi* is on point here, because in each of those cases, the
5    suspect invoked his right to remain silent. Here, by contrast, appellant expressed
     uncertainty as to whether he wished to talk. Under the circumstances, Skiles was
6    permitted to attempt to clarify his intentions. (See *People v. Wash, supra,* 6
     Cal.4th at pp. 238-239.) Skiles's questions were directed at obtaining that
7    clarification; they were not the type of questions that an officer should know are
     reasonably likely to elicit an incriminating response. (See, e.g., *Rhode Island v.*
8    *Innis, supra,* 446 U.S. at pp. 301-303; *People v. Huggins* (2006) 38 Cal.4th 175,
     198; *People v. Haley* (2004) 34 Cal.4th 283, 301-303 & cases cited; *People v.*
9    *Wash, supra,* 6 Cal.4th at pp. 238-239.) "This is not a case ... where the police
     failed to honor a decision of a person in custody to cut off questioning, either by
10   refusing to discontinue the interrogation upon request or by persisting in repeated
     efforts to wear down his resistance and make him change his mind." (*Michigan v.*
11   *Mosley, supra,* 423 U.S. at pp. 105-106.)

12
     In light of the foregoing, appellant was not entitled to suppression of his
13   statement.FN16 This being the case, the second half of the statement, which
     followed Skiles reminding appellant of his *Miranda* rights after the interview was
14   paused so the tape could be changed, is likewise not subject to exclusion.
     "Because the tree was not poisonous, its fruit was not tainted." (*People v. Mickey*
15   (1991) 54 Cal.3d 612, 652; accord, *Colorado v. Spring, supra,* 479 U.S. at pp.
     571-572.)
16
     FN16. Given our conclusion, we need not separately discuss what occurred with a
17   view toward appellant's right to counsel, as opposed to his right to remain silent.

18   (Ex. A at *6-*13.)

19        Once an accused is properly advised of his or her Miranda rights, he/she may issue a

20   waiver so long as it is voluntary, intelligent, and knowing.  Miranda, 384 U.S. at 475.  There are

21   two distinct dimensions to the waiver inquiry: the "waiver must be 'voluntary in the sense that it

22   was the product of a free and deliberate choice rather than intimidation, coercion, or deception,"

23   and 'made with a full awareness of both the nature of the right being abandoned and the

24   consequences of the decision to abandon it.'" Berghuis v. Thompkins, __ U.S. __, __, 130 S.Ct.

25   2250, 2260, 176 L.Ed.2d 1098, __ (2010) (quoting Morgan v. Burbine, 475 U.S. 412, 421

26   (1986).  The validity of a waiver depends upon the totality of the circumstances, including the

27   background, experience and conduct of the defendant.  United States v. Bernard S., 795 F.2d

28   749, 751 (9th Cir. 1986).  The government must prove waiver by a preponderance of the

1 evidence. Colorado v. Connelly, 479 U.S. 157, 168-169 (1986).

2 Petitioner contends his waiver was not voluntary because his response to speak to the

3 investigating officer was unequivocally negative. Petitioner further argues that even if his

4 response was equivocal, the officers follow-up questions were not limited to clarifying whether

5 Petitioner intended to waive or invoke his Fifth Amendment rights. The portion of the tape

6 interview sited above by the state appellate court, and reviewed by this Court, demonstrates that

7 Petitioner's statements to the officer showed that he was uncertain whether to waive his rights

8 and the officer was allowed to clarify to which Petitioner issued a voluntary waiver. The Court

9 of Appeal's determination was not unreasonable.

10 V.    Confrontation Clause Violation

11 Petitioner contends the trial court violated his rights under the confrontation clause of the

12 Sixth Amendment by admitting Jose Jiminez's testimony.

13 The California Court of Appeal issued the last reasoned decision denying the claim as

14 follows:

15    A. *Background*

16    During in limine motions, the parties argued over the admissibility of Jose
   Jiminez's expected testimony. Defense counsel informed the court that, according
17    to the report of Zavala's investigator, Jiminez said he overheard appellant say, in
   the presence of Vidal, Zavala, and the Soto brothers, "we finally got that nigger."
18    Vidal responded, "he won't be bothering us anymore." Appellant then told the
   others that if they said anything different than what he had told them to say, he
19    was going to stick a broom handle "up their ass." Although appellant did not
   challenge admission of his own alleged statements, he asked the court to exclude
20    Vidal's response as inadmissible hearsay, and because "us" was vague and
   ambiguous. The prosecutor responded that Vidal's statement was made in
21    appellant's presence and "us" could be understood in the context of the
   conversation, and he argued that the participants were still talking about a
22    conspiracy. Defense counsel countered that any conspiracy was no longer in
   existence when the conversation took place, and he argued the hearsay was
23    inadmissible pursuant to *Crawford v. Washington* (2004) 541 U.S. 36 *(Crawford),
   Bruton v. United States* (1968) 391 U.S. 123, and *People v. Aranda* (1965) 63
24    Cal.2d 518 (*Aranda* ).FN17

25    FN17. *Aranda* was partially abrogated by constitutional amendment as stated in
   *People v. Fletcher* (1996) 13 Cal.4th 451, 465.
26

27    Although rejecting the notion Vidal's statement could be viewed as having been
   made in furtherance of a conspiracy, the court concluded it was admissible as an
28    adoptive admission, as well as because it showed the relationship between Vidal

and appellant. The court ruled that the meaning of "us" was a question for the jury.

At trial, Jiminez testified that he was contacted by Zavala's investigator, Ruben Armenta, in July 2001. Jiminez related to Armenta that, sometime in the couple of days between when Eric Jones was in the news and Zavala's arrest, he was present in the paint shed in back of Zavala's home when he overheard a conversation between appellant, Zavala, and Vidal. While Jiminez knew the Soto brothers, he could not recall whether either of them was present.

Although Jiminez professed at trial not to remember what was said during the conversation, he confirmed that he gave Armenta an accurate and truthful statement. Domingo Flores, an investigator from the district attorney's office, went over that statement with Jiminez about a month and a half before trial. Jiminez acknowledged telling Flores that he heard appellant say, "we finally got that nigger[,]" then Vidal responded, "he won't be bothering us anymore [,]" and appellant then told the other individuals who were present that if they said anything different than what he had told them to say, he was going to "stick a broom handle up their ass[.]" Jiminez subsequently told Cynthia Dupuis, appellant's investigator, that the conversation occurred on January 27, 2001, and that Vidal was the one who commented about having gotten the victim and that he would not be bothering them anymore.

Jurors subsequently were instructed on the use of adoptive admissions, to wit: "If you should find from the evidence that there was an occasion when the defendant one, under conditions which reasonably afforded him an opportunity to reply; two, failed to make a denial in the face of an accusation expressed directly to him or in his presence, charging him with a crime for which the defendant is now on trial or tending to connect him with its commission; and three, that he heard the accusation and understood its nature, then the circumstance of his silence and conduct on that occasion may be considered against him as indicating an admission that the accusation thus made was true. [¶] Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it. Unless you find that the defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard his statement."

B. *Analysis*

As was the case at trial, appellant does not challenge admission of Jiminez's testimony concerning what he himself said. Instead, he says Vidal's statement, as related by Jiminez, constituted inadmissible hearsay.FN18

FN18. Appellant appears to assume Vidal said only, "he won't be bothering us anymore." We will do likewise, although our analysis would be the same even if Vidal, and not appellant, said, "we finally got that nigger." In addition, since the trial court did not admit the statement under the coconspirator exception to the hearsay rule (Evid.Code, § 1223), we agree with respondent that we need not decide whether the statement qualified for admission on that basis. Under the circumstances, respondent's failure to address appellant's argument on this point does not, contrary to appellant's contention, constitute a concession by respondent that appellant's claim has merit.

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid.Code, § 1200, subd. (a).) Except as provided by law, it is inadmissible. (*Id.,* subd. (b).) However, " '[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.' (Evid.Code, § 1221.) Under this provision, 'If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] 'For the adoptive admission exception to apply, ... a direct accusation in so many words is not essential.' [Citation.] 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion,

or equivocation may be considered as a tacit admission of the statements made in his presence.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189; accord, *People v. Roldan* (2005) 35 Cal.4th 646, 710.)

Appellant concedes there was no evidence he did not hear Vidal's statement. Nor is there any suggestion he failed to understand it, had no opportunity to reply, or failed to speak because he was relying on his Fifth Amendment rights. (See *People v. Roldan, supra,* 35 Cal.4th at p. 711.) Instead, he argues Vidal's statement was not made under circumstances that normally would call for a response from appellant, because Vidal's use of the pronoun "us" was unclear and ambiguous and he was not necessarily including appellant as one of the people who would no longer be bothered by Jones.

We disagree. The evidence showed appellant was a participant in the conversation. In fact, there was evidence that he was the first one to use the inclusive pronoun "we." In any event, if Vidal had not been including appellant in "us," one would have expected appellant to clarify that the statement did not apply to him. Instead, he responded with a threat that, by its reference to the sexual assault of Jones, implicitly confirmed his participation in what happened. Accordingly, "[t]he circumstances warranted presenting the evidence to the jury and letting the jury decide what weight to give it. 'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' [Citation.] The court correctly instructed the jury how to consider the evidence. [Citation.]" (*People v. Riel, supra,* 22 Cal.4th at pp. 1189-1190 [rejecting argument that, when one assailant said "they" did something, it was unclear whether he was including defendant or only meant himself & another participant; circumstances supported conclusion reference was to all three, as all three were present, defendant spoke first, & assailant whose statement was challenged was responding to question asked of defendant]; see also *People v. Jurado* (2006) 38 Cal.4th 72, 116-117 [witness properly was allowed to relate accomplice's out-of-court statement that "we" took care of problem & "we" dumped body as adoptive admission by defendant where defendant was sitting on couch with accomplice, circumstances

called for denial or protest if statement was inaccurate, & nothing prevented defendant from responding]; *People v. Roldan, supra,* 35 Cal.4th at pp. 710-711 [witnesses were properly allowed to recount incriminating comments they overheard while defendant and two others discussed crime; that witnesses did not specifically attribute each comment to particular speaker was irrelevant where defendant heard comments, had opportunity to reply, & comments were made under circumstances that normally would call for response]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1011-1012 [statement to defendant need not be free from all ambiguity & clearly accusatory]; *People v. Avalos* (1979) 98 Cal.App.3d 701, 711 [defendant responded, "'Oh Shit,'" to statement implicating him in crimes; because whether response was denial or failure to deny was question of fact, jury should have been instructed to disregard accusatory statement unless it found defendant's conduct was admission that accusation was true].) In short, the trial court did not err by admitting the challenged evidence as an adoptive admission.

Nor did admission of the evidence violate appellant's rights under the confrontation clause of the Sixth Amendment to the United States Constitution. FN19 In this regard, it is important to note that any Sixth Amendment concerns focus on Vidal's out-of-court statement, not Jiminez's in-court recitation of that statement. Appellant confronted and cross-examined Jiminez at trial, thereby allowing jurors to determine whether he was a reliable and credible witness and what weight, if any, to afford his testimony. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 608-609.)

FN19. Respondent contends appellant's constitutional claims are forfeited for failure to raise them in the trial court. The question is a close one. Even where a Sixth Amendment-based claim is at issue, "[a] general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal." (*People v. Marks* (2003) 31 Cal.4th 197, 228; *People v. Catlin* (2001) 26 Cal.4th 81, 138, fn. 14; see *People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8 [bare references to confrontation rule & inability to cross-examine insufficient to preserve Sixth Amendment claim for review].) On the other hand, "[a]n objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide. [Citations.] In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented. [Citations.]" (*People v. Scott* (1978) 21 Cal.3d 284, 290.) In light of defense counsel's repeated references to *Crawford, supra,* 541 U.S. 36, and the manner in which the court and attorneys discussed the issue, we will assume the confrontation claim has been sufficiently preserved.

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' In *Crawford v. Washington [,supra,]* 541 U.S. 36, 53-54 ..., [the United States Supreme Court] held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' A critical portion of this holding ... is the phrase 'testimonial statements.' Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, ---- [126 S.Ct. 2266, 2273].)

"Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Crawford, supra,* 541 U.S. at pp. 51-52.) As is pertinent here, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' [Citation.]" (*Id.* at p. 51.)

"Prior to *Crawford,* the admission of a hearsay statement under a firmly-rooted exception to the hearsay rule or when there were indicia of reliability did not violate a defendant's right of confrontation. (*Ohio v. Roberts* (1980) 448 U.S. 56, 66[ ] [ (*Roberts*) ].) After *Crawford,* a 'nontestimonial' hearsay statement continues to be governed by the *Roberts* standard, but the admission of a 'testimonial' hearsay statement constitutes a violation of a defendant's right of confrontation unless the declarant is unavailable to testify at trial and the defense had a prior opportunity for cross-examination. [Citation.]" (*People v. Corella* (2004) 122 Cal.App.4th 461, 467.) FN20 Vidal's statement, made as it was to a group of acquaintances in (they thought) private, was clearly not "testimonial" within the meaning of *Crawford* and the Sixth Amendment. (See *People v. Butler* (2005) 127 Cal.App.4th 49, 59.)

FN20. *Crawford* overruled *Roberts,* insofar as testimonial hearsay is concerned. (*Crawford, supra,* 541 U.S. at pp. 59-62.)

Under the *Roberts* analysis, "a hearsay exception [is] 'firmly rooted' if, in light of 'longstanding judicial and legislative experience,' [citation], it 'rest[s][on] such [a] solid foundatio[n] that admission of virtually any evidence within [it] comports with the "substance of the constitutional protection."' [Citation.]." (*Lilly v. Virginia* (1999) 527 U.S. 116, 126 (plur. opn. of Stevens, J.).) The adoptive admissions exception meets this standard. (*People v. Jennings* (2003) 112 Cal.App.4th 459, 472; see *United States v. Monks* (9th Cir.1985) 774 F.2d 945, 952.) Moreover, Vidal's statement bore indicia of reliability for the very reasons it did not constitute testimonial hearsay.

"The right of confrontation is not violated when the jury hears evidence, from a witness subject to cross-examination, relating a defendant's own out-of-court statements and adoptive admissions. [Citations.]" (*People v. Jurado, supra,* 38 Cal.4th at p. 117.) "[B]y reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions,* and are admissible on that basis as a well-recognized exception to the hearsay rule. [Citation .] Being deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant. Accordingly, no confrontation right is impinged when those statements are admitted as adoptive admissions without providing for cross-examination of the declarant." (*People v. Silva* (1988) 45 Cal.3d 604, 624.) This is so even in light of *Crawford.* (See *People v. Roldan, supra,* 35 Cal.4th at p. 711, fn. 25.) Additionally, and as previously noted, jurors were instructed that evidence of an accusatory statement was not received to prove

the truth of that statement, but only as it supplied meaning to the silence and conduct of the accused in the face of it, and that, unless they found such silence and conduct to indicate an admission that the accusatory statement was true, they were to disregard the statement. Because Vidal's statement was admitted for a nonhearsay purpose, appellant's Sixth Amendment rights were not implicated. (*People v. Combs* (2004) 34 Cal.4th 821, 843.) FN21

FN21. Respondent notes that the trial court also admitted Vidal's statement for the nonhearsay purpose of showing his relationship with appellant. We agree that, in light of appellant's attempt, in his statement to Skiles, to minimize his relationship with Vidal and the prosecutor's use of aiding and abetting and conspiracy theories of liability, this was a relevant purpose. (See *People v. Bunyard* (1988) 45 Cal.3d 1189, 1204.) Appellant says that if this is true, then a "substantial" instructional error occurred, because the jury was never instructed that Jiminez's testimony was admitted for that limited purpose. Appellant is mistaken, since, except in "'an occasional extraordinary case'"-which this is not-trial courts have no duty to instruct, sua sponte, on the limited admissibility of evidence. (*People v. Lang* (1989) 49 Cal.3d 991, 1020; accord, *People v. Clark* (1992) 3 Cal.4th 41, 130-131.)

(Ex. A at *13-*16.)

Here, the appellate court initially determined the statement by Vidal to Jiminez (and others) qualified as a adoptive admission under state law and was properly admitted by the trial court. Additionally, the appellate court found the admission of this statement did not violate Petitioner's constitutional rights because the circumstances under which the statement was made did not implicate Fifth or Sixth Amendment concerns. There is simply no showing that the state court's rejection of this claim was objectively unreasonable given the statement between Vidal and Jiminez was private in nature and was non-testimonial. The Court of Appeal properly pointed out that nontestimonial statements do not implicate the Confrontation Clause. Giles v. California, 554 U.S. 353, 376 (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause.") (emphasis in original); Whorton v. Bockting, 549 U.S. 406, 420 (2007) (*Crawford* eliminated Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements); United States v. Sine, 493 F.3d 1021, 1035 n. 11 (9th Cir. 2007) ("Only testimonial out-of-court statements raise Confrontation Clause concerns."). The appellate court reasonably found that Vidal's statement made to a group of acquaintances in what they thought was private, was clearly not "testimonial" within the meaning of Crawford and Petitioner's challenge is without merit.

VI.    Prosecutorial Misconduct

1    Petitioner contends the prosecutor committed misconduct by 1) eliciting testimony from

2    witness Juanita Zavala regarding Petitioner's relationship with a cohort; 2) questioning of

3    witness Ralph Arivzu in a manner alleged to insinuate a relationship between Petitioner and the

4    same cohort, and 3) arguing of allegedly unsound inferences from the evidence.

5

6    The appellate court found that each instance of alleged misconduct was not intentional on

7    the part of the prosecutor and, even if so, there was no resulting prejudice.

8    A habeas petition will be granted for prosecutorial misconduct only when the misconduct

9    "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

10   Darden v. Wainwright, 477 U.S. 168, 171 (1986) (*quoting* Donnelly v. DeChristoforo, 416 U.S.

11   637, 643 (1974)); see Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995).  To constitute a due

12   process violation, the prosecutorial misconduct must be "of sufficient significance to result in the

13   denial of the defendant's right to a fair trial."  Greer v. Miller, 485 U.S. 756, 765 (1987) (*quoting*

14   United States v. Bagley, 473 U.S. 667 (1985)).  Under this standard, a petitioner must show that

15   there is a reasonable probability that the error complained of affected the outcome of the trial -

16   i.e., that absent the alleged impropriety, the verdict probably would have been different.

17   With regard to Juanita Zavala's statement that Petitioner was Vidal's boss, Petitioner has

18   failed to show that the prosecutor had anticipated such a response from Zavala when he asked

19   how she knew Petitioner.  Indeed, the record demonstrates that Zavala's testimony was quite

20   unexpected given that her statement was not in any police reports.  In any event, even if the

21   prosecutor erred, there is no showing of prejudice.  The trial court immediately sustained defense

22   counsel's objection to the testimony.   (RT 1481.)  After defense counsel moved and the trial

23   court denied the motion for a mistrial, the court informed counsel it could give the jury an

24   admonishment to disregard Juanita's statement.  Counsel agreed with the trial court.  (RT 1491.)

25   The following day, after conferring with counsel, the trial court admonished the jury as follows:

26           Before I get started, my job up here, as much as anything else at this stage
         of the proceedings, is to be a referee.  The lawyer may make objections.  The
27           reason for that is they want to make sure only admissible evidence comes in front
         of the jury.  And my job, then, is to rule on those objections. [¶] So let me reiterate
28           and repeat an instruction I gave to you, because we've have [sic] had some

1   objections, like in all trials.

2        Statements made by the attorneys during the trial are not evidence.
3   However, if the attorneys stipulate or agree to a fact, you must regard that fact as
    proven. [¶] If an objection is sustained to a question, do not guess what the answer
4   might have been.  Do not speculate as to the reason for the objection. [¶] Do not
    assume to be true any insinuation suggested by a question asked a witness.  A
5   question is not evidence and may be considered only if it helps you understand the

6   answer. [¶] Do not consider for any purpose any offer of evidence that is rejected
    or any evidence that is stricken by the Court.  Treat it as though you had never
7   heard of it.

8        For example, if there's an objection, say, on the grounds of hearsay,
    you've already heard the answer and I sustain the objection, that objection – that
9   answer by the witness should not have been given and you are to disregard that.
    Okay?

10

11  (RT 1610-1611.)

12       The appellate court properly determined that the admonition cured any potential prejudice

13  of Zavala's testimony that Petitioner was Vidal's boss.  The jury is presumed to follow the

14  instructions by the trial court and there is no evidence it did not do so in this instance.  See e.g.

15  Weeks v. Angelone, 528 U.S. 225, 234 (2000).

16       Petitioner also challenges the testimony by Ralph Arivzu regarding buying

17  methamphetamine at Petitioner's home, and Arivzu's observations that Petitioner and Vidal were

18  "partners."  Petitioner contends the prosecutor committed misconduct when questioning Arivzu.

19  The prosecutor sought to elicit testimony about Arivzu's conclusion that Vidal was Petitioner's

20  runner or right hand man.  The trial court ruled that only evidence, not conclusions, would be

21  allowed, and defense counsel's objections to the questioning of Arivzu were sustained.

22       During questioning by the prosecutor, the trial court excused the jury and told the

23  prosecutor:

24       All right.  Perhaps I didn't make myself clear.  Just because somebody
    tells somebody else that he believes that one person worked for another, doesn't
25  mean that now when you get on examination you say you said that, what do you
    mean by that? [¶] And because I was afraid of this, what I want you to do is ask
26  him direct questions. [¶] Now, we've got the gentlemen who's indicated they were
    around each other a lot.  They appear to be buddies.  We have that this is Seriales'
27  house and Vidal was cleaning out dog messes in the backyard.  Other than that,
    these are the type of direct questioning I'm asking, but I'm not going to allow you
28  to ask you told them that you thought Vidal worked for Seriales.  What do you

30

1  base that on?  That's just not right.

2  (RT 1660-1661.)

3      The prosecutor explained that he was merely trying to ask the question in an innocuous

4  way with reference to the issue and was attempting to impeach Arivzu with a prior inconsistent

5  statement.  The court then allowed the prosecutor to question Arivzu about his statement to an

6  investigator that Vidal was Petitioner's "right hand man or his runner," outside the presence of

7  the jury.  (RT 1664-1665.)  The court ultimately determined that Arivzu was speculating about

8  the "partner" relationship between Vidal and Petitioner.  After the jury returned, Arivzu testified

9  about seeing Vidal and Petitioner driving around town together in Petitioner's Jaguar.  (RT 1668-

10  1770.)

11      Even if it is assumed the prosecutor erred in the questioning of Arivzu, Petitioner has

12  failed to demonstrate any resulting prejudice, i.e. that there is a reasonable probability the jury

13  would have reached a result more favorable to Petitioner had the prosecutor refrained from the

14  improper questioning.  The trial court instructed the jury to disregard the prosecutor's challenged

15  question of Arivzu immediately after the question was asked.  (RT 1658.)  In addition, there was

16  no evidence presented that Vidal was Petitioner's runner or right hand man because Arivzu never

17  testified to such.  Moreover, the court later instructed the jury that the attorney's questions were

18  not evidence and the facts must be determined only from the evidence presented.  (RT ,

19  1890,1892; CT 1284, 1286 [CALJIC Nos. 1.00, 1.02].)

20      Lastly, Petitioner objects to the testimony by Jose Jiminez.  During redirect examination,

21  Jiminez testified that he had been beaten up in prison after granting an interview regarding this

22  case, and he was labeled as a "rat."  The prosecutor asked Jiminez whether Petitioner was able to

23  get somebody to beat him up in prison.  Before Jiminez could respond, the court sustained

24  defense counsel's objection.

25      Defense counsel subsequently argued the prosecutor had committed misconduct by

26  suggesting that Petitioner had Jiminez beaten up in prison without any supporting justification.

27  Counsel requested that the jury be admonished that the prosecutor had committed misconduct.

28  The prosecutor responded that the basis for his question was supported by the untimely report

31

given to him by defense counsel.  The prosecutor stated that any problem could have been prevented had defense counsel provided the report in a timely manner.  The court agreed to admonish the jury and stated as follows:

> Okay, ladies and gentlemen.  One thing, when this last witness was on the stand, Jose Jiminez, he was talking about getting beat-up in prison.  Because of this, there's no evidence Keith Seriales was involved in beating him up or had in any way directed that.  He just said I was beat-up because of this.

(RT 1598.)  Defense counsel later renewed his request for the court to find the prosecutor committed misconduct during questioning of Jiminez, and the court again denied the request stating,

> I couldn't say that that is intentional misconduct.  The report was given to the prosecutor.  He asked for a minute to read it.  He read through it quickly. [¶]  And, obviously, Jose Jiminez he alleged had been beaten-up twice because of this report.  So I think it was a spin on it that is not supported by the facts, but I don't feel comfortable in calling it misconduct.

(RT 1606.)  The appellate court reasonably found that given the circumstances the prosecutor faced when questioning Jiminez there was not intentional misconduct on his part, nor was there any prejudice because the trial court immediately sustained defense counsel's objection, admonished the jury, and no further comment regarding this issue was presented to the jury.  Accordingly, the state court's determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

VII.  Insufficient Evidence to Support Convictions

Petitioner contends there was insufficient evidence to support his convictions.  More specifically, Petitioner presents a three-part argument, claiming (1) there was not sufficient evidence to support murder, special circumstance, and felony-murder findings under the theory Petitioner was a direct participant and personally committed the acts; (2) there was not sufficient evidence to support murder, special-circumstance, or felony-murder findings, or the substantive crimes of torture, sexual penetration, and kidnapping, under a theory that Petitioner knowingly aided and abetted or conspired to commit those acts; and (3) there was insufficient evidence to sustain his convictions on the theory that torture, electrocution, sodomy, kidnapping, and murder

were reasonably foreseeable consequences of assault, the only crime Petitioner purportedly aided

and abetted or conspired to commit.

In the last reasoned decision, the appellate court found sufficient evidence to support

Petitioner's convictions stating:

Having determined that appellant's statement to Skiles and Jiminez's testimony
were properly admitted into evidence, we turn now to appellant's claim the
evidence was insufficient to sustain his convictions. Appellant presents a
complicated three-part argument, asserting (1) there was insufficient evidence to
support murder, special-circumstance, and felony-murder findings under the
theory appellant was a direct participant and personally committed the acts; (2)
there was insufficient evidence to support murder, special-circumstance, or
felony-murder findings, or the substantive crimes of torture, sexual penetration,
and kidnapping, under a theory appellant knowingly aided and abetted or
conspired to commit those acts; and (3) there was insufficient evidence to sustain
appellant's convictions on a theory that torture, electrocution, sodomy,
kidnapping, and murder were reasonably foreseeable consequences of assault, the
only crime appellant purportedly aided and abetted or conspired to commit.

We need not concern ourselves with the first and third permutations of appellant's
argument, as the first addresses a theory upon which appellant was not tried, while
the third addresses theories we can tell the jury rejected. With respect to the
former, the prosecutor's assertion that appellant was an active participant in events
was premised on the theory appellant was an aider and abettor or coconspirator.
Appellant was not tried on the theory he personally committed the various
criminal acts. With respect to the latter, a conspiracy was defined for jurors not in
terms of an agreement and specific intent to commit some unspecified crime, but
expressly in terms of an agreement and intent to commit the uncharged crime of
assault with force likely to produce great bodily injury. Jurors were told that a
member of a conspiracy was guilty not only of the crime he and his confederates
conspired to commit, but also the natural and probable consequence of any crime
of a coconspirator to further the objective of the conspiracy, and they were
instructed on how to determine whether the charged offenses were the natural and
probable consequences of the agreed-upon objective of the conspiracy. We know
jurors rejected the notion of a conspiracy to commit assault, however: Jurors were
further instructed that murder predicated solely on such a conspiracy constituted
only second degree murder, yet they returned a verdict of murder in the first
degree. They were further instructed that if appellant were found guilty, as a
coconspirator, of one of the charged felonies solely because that crime was a
natural and probable consequence of an assault with force likely to produce great
bodily injury, the charged felony could not be the basis for murder predicated on
the felony-murder rule, or the special circumstance of murder in the commission
of a felony. Jurors returned true findings on both felony-murder special
circumstances; moreover, their verdict on the murder by torture special
circumstance reflects an express finding of aiding and abetting with intent to kill.

Similarly, we can tell jurors rejected the theory appellant aided and abetted an
uncharged assault. Jurors were told that, in order to find appellant guilty of a
charged offense under the natural and probable consequences doctrine, they had to
find that the uncharged crime of assault with force likely to produce great bodily
injury was committed, that appellant aided and abetted that crime, that a
coprincipal committed the charged offenses, and that those offenses were natural

and probable consequences of the uncharged assault. As was the case with conspiracy, jurors were instructed that murder predicated solely on aiding and abetting assault with force likely to produce great bodily injury constituted only second degree murder, but they returned a verdict of first degree murder.FN22 Moreover, the prosecutor clearly did not rely on the natural and probable consequences theory in his argument to the jury, barely mentioning it and at one point telling jurors it did not apply to the facts of the case.

FN22. No claim of instructional error is raised; hence, we express no opinion concerning the correctness of the instructions.

In light of the foregoing, it is apparent jurors convicted appellant as an aider and abettor of the charged crimes, without reference to the natural and probable consequences doctrine. Because, as we shall explain, the evidence is sufficient to uphold the convictions and special-circumstance findings on that theory, we address it alone. The record does not suggest, much less demonstrate a reasonable probability, that the jury relied on any factually unsupported theory. (See, e.g., *People v. Sanchez* (2001) 26 Cal.4th 834, 851-852; *People v. Johnson, supra,* 6 Cal.4th at p. 42; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

A. *Applicable Legal Principles*

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson, supra,* at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal .App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and it applies equally to special circumstances (*People v. Mickey, supra,* 54 Cal.3d at p. 678).

Citing *People v. Toledo* (1948) 85 Cal.App.2d 577 (*Toledo* ), appellant contends the People were bound by the exculpatory evidence they presented by way of appellant's statement to Skiles, and that this constrains our evidentiary review. In *Toledo,* the defendant was charged with murder and convicted of manslaughter. He admitted striking the fatal blow, but claimed self-defense. The physical evidence was consistent with his version of events. Construing former section 1105,FN23 the appellate court held that a defendant need only raise a reasonable doubt with respect to self-defense; that the defendant's statement did so; and that there was no rational way to believe the defendant's concession that he struck the victim, yet reject the remaining exculpatory portion of his statement. Accordingly, the appellate court ruled, the record did not support the defendant's manslaughter conviction. (*Toledo, supra,* 85 Cal.App.2d at pp. 579-582.)

FN23. See now section 189.5. Subdivision (a) of this statute, which is substantively unchanged from subdivision (a) of former section 1105, provides: "Upon a trial for

murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant, *unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.*" (Italics added.)

Based on *Toledo,* it has been stated that "if the prosecution presents as a part of its case a statement of the defendant *evidencing justification* for the alleged crime, the prosecution is bound by that evidence *in the absence of proof to the contrary.* [Citations.]" (*People v. Griego* (1955) 136 Cal.App .2d 51, 56, italics added.) As has been recognized, however, "the so-called *Toledo* doctrine (whose genesis seems to have been merely an argument offered on appeal) actually refers to a principle of judicial review invoked in homicide prosecutions obviating a defendant's burden of showing mitigation or justification where the prosecution's proof itself tends to show same or a lesser unlawful homicide. [Citations.] The rule in its amended form is properly restricted to those cases where 'all the prosecution evidence points to *excuse or mitigation.* If there is substantial evidence incompatible with the theory of *excuse or mitigation,* the jury may consider all the evidence and determine whether the act amounted to unlawful homicide. [Citations.]' [Citation.] To the extent that the doctrine is founded upon a notion that the prosecution is bound by their witnesses' statements [citation] on the antiquated theory of vouchsafing one's own witnesses [citation], that theory has long since been discarded in favor of the modern rule allowing impeachment of a witness by any party, 'including the party calling him.' [Citations.] In the final analysis the question of defendant's guilt must be resolved from *all* the evidence considered by the jury. [Citations.]" (*People v. Ross* (1979) 92 Cal.App.3d 391, 400, fn. omitted; accord, *Matthews v. Superior Court* (1988) 201 Cal.App.3d 385, 393-394.)

Here, appellant's statement did not purport to show his commission of a homicide under circumstances involving justification or excuse FN24 or a lesser unlawful homicide,FN25 but instead his lack of knowing involvement in the various charged offenses, including murder. Assuming this is the type of excuse or mitigation referred to by *Toledo* and cases interpreting it-which we doubt-"'it does not necessarily follow that appellant's account of the killing, though uncontradicted by direct evidence, should control the jury.'" (*People v. Acosta* (1955) 45 Cal.2d 538, 541, quoting *People v. Salaz* (1924) 66 Cal.App. 173, 181.) "[C]redibility is governed by more than just the words transcribed by a court reporter. A trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so. [Citations.]" (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) Appellant's own statement (particularly his account of leaving and returning to the Soto residence at will) and Jiminez's testimony furnished ample rational grounds for disbelieving appellant's claim of lack of knowing involvement. Accordingly, the prosecutor was not bound by, and the jury was entitled to reject, those portions of appellant's statement that were clearly self-serving or implausible under the circumstances (*People v. Silva* (2001) 25 Cal.4th 345, 369; *People v. Wharton* (1991) 53 Cal.3d 522, 547), and we review the record accordingly.

FN24. Homicide is excusable "1. When committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent. [¶] 2. When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner." (§ 195.)

35

Homicide is justifiable when committed by any person "1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or [¶] 2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or, [¶] 3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or, [¶] 4. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace." (§ 197.)

FN25. "Manslaughter is the unlawful killing of a human being without malice. It is of three kinds: [¶] (a) Voluntary-upon a sudden quarrel or heat of passion. [¶] (b) Involuntary-in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection .... [¶] (c) Vehicular...." (§ 192.) Manslaughter also occurs when a defendant kills another person because the defendant actually, but unreasonably, believes he or she is in imminent danger of death or great bodily injury. (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) As previously explained, we focus on appellant's liability as an aider and abettor of the charged offenses. Someone who aids and abets is a principal in the crime(s) committed. (§ 31.) "To be guilty of a crime as an aider and abettor, a person must 'aid[ ] the [direct] perpetrator by acts or encourage [ ] him [or her] by words or gestures.' [Citations.] In addition, except under the natural-and-probable-consequences doctrine [citations], which is not implicated on the facts presented here, the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' [FN26] that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623-624; see *People v. Beeman* (1984) 35 Cal.3d 547, 560.) In short, "proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus-a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea-knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus-conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

FN26. The direct (actual) perpetrator must harbor whatever mental state is required for each crime charged. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123.)

The doctrine of aiding and abetting """snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime,

even though the actor does not personally engage in all of the elements of the crime." [Citation.]' [Citation.] Aiding and abetting does not require participation in an agreement to commit an offense, but merely assistance in committing the offense. [Citation.]" (*People v. Morante* (1999) 20 Cal.4th 403, 433, fn. omitted.) However, "if a person in fact aids, promotes, encourages or instigates commission of a crime, the requisite intent to render such aid must be formed prior to or during 'commission' of that offense. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) This does not mean advance knowledge is a prerequisite for liability (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 742); "[a]iding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th

518, 532.) Moreover, "it is not necessary that the primary actor expressly communicate his criminal purpose to the defendant since that purpose may be apparent from the circumstances. [Citations.]" (*Id.* at pp. 531-532.)

In determining whether the evidence was sufficient to support appellant's convictions, we apply these principles to the elements of the charged offenses. With respect to first degree murder, appellant's jury was presented with theories of premeditation and deliberation, felony murder predicated upon kidnapping and penetration with a foreign object, and murder by means of torture.FN27 Where premeditated murder is at issue, "[e]vidence concerning motive, planning, and the manner of killing are pertinent to the determination of premeditation and deliberation, but these factors are not exclusive nor are they invariably determinative. [Citation.]" (*People v. Silva, supra,* 25 Cal.4th at p. 368; see *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Insofar as felony murder is concerned, "'[w]hen the prosecution establishes that a defendant killed while committing one of the felonies section 189 lists ..., "by operation of the statute the killing is deemed to be first degree murder as a matter of law."' [Citation.] Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) "'The mental state required is simply the specific intent to commit the underlying felony; neither intent to kill, deliberation, premeditation, nor malice aforethought is needed. [Citations.]'" (*People v. Hart* (1999) 20 Cal.4th 546, 608.) As for murder by means of torture, "'[m]urder by torture "is 'murder committed with a wil[l]ful, deliberate and premeditated intent to inflict extreme and prolonged pain.' " [Citation.] "The culpable intent is one to cause pain for '"the purpose of revenge, extortion, persuasion or for any other sadistic purpose."'" [Citation.] There is no requirement that the victim be aware of the pain. [Citation.]' [Citation.] "'However, there must be a causal relationship between the torturous act and death, as Penal Code section 189 defines the crime as murder 'by means of' torture. [Citation.]" [Citation.]' [Citation.] [¶] 'The finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death.' [Citation.] '[F]or purposes of proving murder by torture, the intent to inflict extreme pain "may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body." [Citation.]'" (*People v. Elliot* (2005) 37 Cal.4th 453, 466-467.) While not necessarily determinative of intent, the severity of the victim's wounds is probative of the issue. (*People v. Mincey* (1992) 2 Cal.4th 408, 433.)

FN27. Section 189 provides in pertinent part: "All murder which is perpetrated by means

of ... torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of ... kidnapping, ... or any act punishable under Section ... 289, ... is murder of the first degree."

Turning to the special circumstances alleged, "[t]he felony-murder special circumstance applies to a murder committed while the defendant was engaged in, or was an accomplice in the commission of, the attempted commission of, or the immediate flight after committing or attempting to commit, various enumerated felonies, including, as relevant here, [kidnapping or foreign object penetration]. FN28 [Citation.] A strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the defendant intended to commit the felony at the time he killed the victim and that the killing and the felony were part of one continuous transaction. [Citations.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 87.) FN29 However, "[i]n order to support a finding of special circumstances murder, based on murder committed in the course of [a felony enumerated in section 190.2, subdivision (a)(17)], against an aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190 .2, subds.(c), (d).)" (*People v. Proby* (1998) 60 Cal.App.4th 922, 927, fn. omitted; see *Tison v. Arizona* (1987) 481 U.S. 137, 157-158.) The torture-murder special circumstance (§ 190.2, subd. (a)(18)) applies where the murder was intentional and involved the infliction of torture. (*People v. Bemore* (2000) 22 Cal.4th 809, 842.) It does not require proof that the acts of torture caused the victim's death. (*Id.* at p. 843.)

FN28. The statute specifically refers to "[r]ape by instrument in violation of Section 289." (§ 190.2, subd. (a)(17)(K).) Aside from the issue of his own culpability, appellant makes no claim that the special circumstance does not apply to what was done to Eric Jones.

FN29. By the time of Eric Jones's murder, the law no longer required that the defendant have a purpose for kidnapping apart from the murder in order to sustain a kidnap-felony-murder special circumstance finding. (§ 190.2, subd. (a)(17)(M); compare *People v. Riel, supra,* 22 Cal.4th at p. 1201.)

With regard to the remaining substantive offenses, count 2 of the information charged appellant with torture in violation of section 206. That statute provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." "As so defined, torture has two elements: (1) the infliction of great bodily injury on another; and (2) the specific intent to cause cruel or extreme pain and suffering for revenge, extortion or persuasion or any sadistic purpose." (*People v. Lewis* (2004) 120 Cal.App.4th 882, 888, fn. omitted.) "Torture focuses upon the mental state of the perpetrator. [Citation.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.) "Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain. [Citation.]" (*People v. Burton* (2006) 143 Cal.App.4th 447, 452.) "[R]evenge, extortion, and persuasion are self-explanatory. Sadistic purpose encompasses the common meaning, '"the infliction of pain on another person for the purpose of experiencing pleasure."' [Citation.] While sadistic pleasure is often sexual, the statute does not require a sexual element. [Citation.]" (*People v. Massie, supra,* at p. 371.) "Absent direct evidence of ... intent, the circumstances of the offense can

establish the intent to inflict extreme or severe pain. [Citations.]" (*People v. Burton, supra,* at p. 452.) "Torture does not require the defendant act with premeditation and deliberation, and it does not require that he intend to inflict prolonged pain. [Citation.] Accordingly, the length of time over which the offense occurred is relevant but not necessarily determinative. [Citation.] Likewise, the severity of the wounds inflicted is relevant but not necessarily determinative. [Citation.]" (*People v. Massie, supra,* at p. 371.) "Also, a jury may infer intent to cause extreme pain from a defendant who focuses his attack on a particularly vulnerable area ... rather than indiscriminately attacking the victim. [Citation.]" (*People v. Burton, supra,* at p. 452.) Finally, although the statute requires the infliction of great bodily injury, it does not require that a defendant personally inflict the torture. (*People v. Lewis, supra,* 120 Cal.App.4th at pp. 888-889.)

Count 3 of the information charged appellant with kidnapping in violation of section 207, subdivision (a), which provides: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." To establish this offense, "the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance. [Citation.]" (*People v. Jones* (2003) 108 Cal.App.4th 455, 462, fn. omitted.)

The remaining counts of the information charged variant forms of foreign object penetration, in violation of section 289-"by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" (*id.,* subd. (a)); "with another person who is under 18 years of age" (*id.,* subd. (h)); and "voluntarily acting in concert with another person, by force or violence and against the will of the victim, ..., either personally or by aiding and abetting the other person," as proscribed by section 264.1[.] The elements of section 289, subdivisions (a) and (h) are apparent, for our purposes, from the wording of the statute. Section 264.1 demonstrates the Legislature's recognition that sexual assault "is even more reprehensible when committed by two or more persons. [Citation.]" (*People v. Jones* (1989) 212 Cal.App.3d 966, 969.) Thus, the statute increases punishment for specified offenses, including the forcible violation of section 289, committed "in concert," in order "to discourage 'gang type' sexual assaults. [Citation.]" (*People v. Jones, supra,* at p. 969.) The statute covers both the person who actually commits the physical act and the person who aids and abets; the latter need neither physically participate in the sexual assault nor be personally present during its commission. (*People v. Lopez* (1981) 116 Cal.App.3d 882, 886.) Although acting in concert is not necessarily synonymous with aiding and abetting (*People v. Jones, supra,* at p. 969), in order to hold a defendant liable for sexual assault in concert as an aider and abettor, the prosecution must prove he or she had the requisite intent for aiding and abetting set out in *People v. Beeman, supra,* 35 Cal.3d at page 560.

B. *Analysis*

"Whether a person has aided and abetted in the commission of a crime is a question of fact, and on appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fn. omitted.) Although the mere presence of the defendant at the scene of the crime does not, standing alone, establish aiding and

abetting (*People v. Villa* (1957) 156 Cal.App.2d 128, 134), it is one factor to be considered. Other relevant factors include companionship and conduct before and after the offense. (*In re Juan G., supra,* 112 Cal.App.4th at p. 5; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.)

We have set out the record evidence at length, *ante,* and need not repeat it here. We conclude it is sufficient to support a finding, by a rational trier of fact, of every element of the various offenses beyond a reasonable doubt. The evidence and reasonably drawn inferences showed appellant's companionship with the other participants-particularly Vidal-both before and after the crimes, a companionship he tried to downplay in his statement to Skiles. Appellant had a motive-the loss of money on the stolen gun Jones had sold him, together with the suggestion Jones had tried to pin the theft on him, and rumors Jones was going to try to rob him-and he knew Vidal had a motive, as Jones had tried to steal Vidal's car. Although the fact dinner had been ordered suggests appellant and Vidal did not know the exact moment events would start to unfold, as soon as Gerardo Soto telephoned appellant's house and told him Jones was there and to bring Vidal, appellant immediately did so, not even waiting for the food to be delivered or telling his wife where he was going. The overall picture is one of preplanned action against Jones, with appellant and Vidal simply waiting to hear that Jones had been lured into the group's clutches.FN30 (See *People v. Hill* (1998) 17 Cal.4th 800, 851-852.)

FN30. In fact, jurors rationally could have concluded appellant and Vidal were not actively involved in capturing Jones by design, since it would be reasonable for the perpetrators to assume Jones would be wary of being in the presence of those who had motives for retaliation against him, and thus that Jones would be easier to ensnare if appellant and Vidal were not around.

Even assuming appellant was not in on the plan from the outset, he admitted knowing Jones would be confronted and beaten; to the extent he professed not to know anything beyond that, his statement suggested either the others told him what they were going to do upon his arrival at the Soto residence, or he almost immediately figured it out.FN31 As we have stated, advance knowledge is not a prerequisite for liability as an aider and abettor; aiding and abetting can be committed on the spur of the moment. (*People v. Swanson-Birabent, supra,* 114 Cal.App.4th at p. 742; *People v. Nguyen, supra,* 21 Cal.App.4th at p. 532.) What matters is whether the intent to render aid was formed prior to or during commission of the offense. (*People v. Cooper, supra,* 53 Cal.3d at p. 1164.) Once appellant arrived at the residence, he saw Portugal with an AK-47. He knew Vidal was carrying a firearm. Both Portugal and Gerardo Soto pointed the AK-47 at Jones's head during the beating. Jones was tied up, and was beaten and kicked by the group. He was beaten badly, with events occurring over the course of several hours, and was moaning from the pain. Appellant was instructed to obtain black plastic, which he believed would be used to wrap Jones. A reasonable inference is that it would be used for further torture or to dispose of Jones's body. While appellant denied obtaining the plastic, he admitted obtaining the duct tape that bound Jones at the time he was killed. Although it was not Skiles's interpretation of appellant's statement, a rational inference can be drawn from the evidence that appellant left the Soto residence more than once, but always returned, despite being aware of what was happening there. A reasonable inference can also be drawn that he obtained the duct tape after hearing Vidal tell Jones that Jones was going to die. We find it particularly significant, as jurors reasonably could have, that appellant was permitted to come and go from the residence at will, yet never once did he refuse to return or use his freedom of action to contact authorities.

Though not dispositive, failure to prevent the crimes is a factor that may be considered in determining aiding and abetting. (*In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460; *People v. Villa, supra,* 156 Cal.App.2d at p. 134.)

FN31. Skiles asked appellant, "Did they tell you what they were going to do?" Appellant responded, "Nah, *not till I got there* and seen all that shit." (Italics added.)

In light of the fact appellant could come and go at will, not only from the residence but between the house and garage, jurors reasonably could have inferred that, instead of merely trying to comfort Ebaniz and keep him calm, appellant actually took charge of the teenager, as Ebaniz was recognized as being the weak link and Vidal was worried he would talk. Appellant's presence helped prevent Ebaniz from trying to leave and possibly alert authorities. In addition, appellant transported Ebaniz to watch the murder, thus further scaring him into silence. Vidal threatened to kill Ebaniz's family, but made no threats against appellant. In fact, it was appellant who, according to Jiminez, subsequently threatened the others to keep them quiet and made specific reference to the sexual assault.FN32

FN32. *In re Michael T.* (1978) 84 Cal.App.3d 907, on which appellant relies, does not persuade us differently. There, a liquor store clerk fatally shot a boy. In retaliation, Kenneth Washington shot and killed one of the clerks. Shortly before the shooting, two persons standing near the liquor store were warned by Michael to get out of the way because there was going to be a shooting at the store. At trial, however, one of these people denied that Michael was the person who had spoken to him, and the other stated he could not be positive because he was drunk at the time. There was testimony that Michael subsequently said, in Washington's presence, something along the lines of, "'We got the guy.'" On appeal from the juvenile court's finding that Michael committed murder, the appellate court found no evidence Michael participated by rendering physical aid or as a conspirator, aside from the statements attributed to him and his presence near the scene of the crime. The appellate court found this evidence insufficient, as mere presence which does not itself assist the commission of the crime, or mere knowledge a crime is being committed and the failure to prevent it, do not amount to aiding and abetting. As for the statements, they may have been mere bravado; they were not proof beyond a reasonable doubt that Michael was admitting guilt for personal participation in the crime. (*Id.* at pp. 909-911.)

Assuming the case was correctly decided and Michael was simply trying to ensure the safety of bystanders and not assist Washington by preventing someone from interfering, appellant's conduct and the purpose and effect of his presence were qualitatively and quantitatively distinguishable from that attributed to Michael. Accordingly, the case does not assist appellant.

Under the circumstances, a rational trier of fact could have concluded that appellant knew of Vidal's intent to torture, kidnap, and kill Jones, and aided and abetted by his presence, by obtaining the duct tape, and by taking charge of Ebaniz and transporting him to witness the murder. (See *People v. Dyer* (1963) 217 Cal.App.2d 176, 180.) A rational trier of fact could have further concluded appellant participated in the sexual assault, based on Jiminez's recitation of his statements; in any event, the foreign object penetration was a species of torture and part of the same course of conduct. (See *People v. Elliot, supra,* 37 Cal.4th at p. 467.) Accordingly, sufficient evidence supports the various convictions and special circumstance findings.

(Ex. A at *17-*25.)

After a thorough review of the record, the Court of Appeal reasonably concluded that the jury had to either find that Petitioner aided and abetted or conspired with others to commit torture, sexual assault, kidnaping, and murder on Jones.  Under California law Petitioner is considered a principal under either scenario.  The Court concludes that the appellate court's denial of this claim was reasonable, because when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have determined beyond a reasonable doubt that Petitioner was guilty of aiding and abetting or conspiring to commit torture, sexual assault, kidnapping, and murder.  As the Court of Appeal found, the evidence at trial established that Petitioner knew Vidal was armed with a handgun and that Vidal was livid with Jones for trying to break into his car and was seeking revenge.  Petitioner admitted that he did not like Jones and believed that Jones would attempt to rob him.  Jones also cost Petitioner $150 for selling him a stolen handgun he later had to return to the licensed owner.  Petitioner admitted he obtained duct tape at Vidal's request and told Detective Skiles he believed Vidal wanted to wrap up Jones like a burrito, and later followed the men in his car to the location where Vidal executed Jones.

The morning after the murder of Jones, Petitioner and others were acting suspiciously and burning trash at the Ranch.  Police discovered metal shoelace eyelets and a brown leather belt in the trash burn barrel which could have reasonably lead to the conclusion that Jones's clothing was taken to the Ranch to be burned.  Jose Jiminez testified that he overheard Petitioner tell Zavala and Vidal that "we finally got that nigger" to which Vidal responded "he won't be bothering us anymore."  Petitioner threatened that if the others said anything he would "stick a broom handle up their ass."  Based on this evidence, it was certainly reasonable for the jury to conclude that Petitioner aided and abetted or conspired with the others to commit all the offenses against Jones, and habeas corpus relief is foreclosed.

VIII.   Eighth Amendment Violation

Petitioner contends that his conviction and/or sentence for first degree murder violates the Eighth Amendment principles governing capital cases because murder shares an element with a

charged special circumstance.  The appellate court rejected the claim stating:

> Appellant contends his rights under the Eighth Amendment to the United States Constitution were violated when the jury was permitted to utilize the same facts to establish both first degree murder and the special circumstances.  As he acknowledges, the California Supreme Court has rejected this argument.  [Citations.] (E.g., *People v. Pollock* (2004) 32 Cal.4th 1153, 1195 & cases cited; *People v. Lewis* (2001) 25 Cal.4th 610, 676; *People v. Bemore, supra,* 22 Cal.4th at p.843; *People v. Holt* (1997) 15 Cal.4th 619, 697-698; *People v. Marshall* (1990) 50 Cal.3d 907, 945-946; *People v. Davenport* (1985) 41 Cal.3d 247, 271 (plur. opn. of Reynoso, J.).)  We do likewise.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

(Ex. A at 44.)

Petitioner's claim is unfounded.  First, even if Petitioner's challenge were to a death sentence, the appellate court's denial of the claim was not objectively reasonable because the Constitution does not prohibit the duplication of elements of charges and special circumstances even in the capital context.  Lowenfield v. Phelps, 484 U.S. 231, 246 (1988).  Second, Petitioner did not receive a death sentence and fails to set forth any precedent of the Supreme Court clearly establishing application of a narrowing principle to the determination of a sentence other than death.  Accordingly, Petitioner's claim is without merit.

IX.    Denial to Continue Sentencing Hearing

Petitioner contends the trial court violated his constitutional rights by refusing to continue the sentencing hearing in order to allow him to develop jury misconduct as an issue for a new trial motion.

"Under both federal and state law, the decision to grant or deny a motion for a continuance is within the trial court's discretion."  Harris v. Henry, 228 Fed.Appx. 710, 712 (9th Cir. 2007).  In order to demonstrate habeas corpus relief based on the trial court's improper denial of a motion for a continuance, a petitioner must show that the abuse of discretion rose to the level of a constitutional violation.  Ferguson v. Schwarzenegger, 267 Fed.Appx. 707, 709 (9th Cir. 2008).

The state court's determination was not unreasonable.  On the day before the sentencing hearing, defense counsel sought a continuance on the ground that additional time was necessary

to investigate and prepare a new trial motion.  The motion was based on two juror interviews and

the need to interview other jurors which could result in possible grounds for a new trial based on

the juror issues.

The California Court of Appeal initially found that Petitioner failed to show due diligence

in preparation for the sentencing hearing.  The appellate court found:

> Due diligence was not shown here.  Given defense counsel's asserted belief that every trial attorney has a duty in a case of this magnitude to conduct juror interviews as a basis for a new trial motion, we see no reason why he could not have arranged, immediately following rendition of the penalty phase verdict, for those jurors who were willing, to speak to him or his investigator.  Jurors were advised, at the conclusion of the trial, that either attorney or his representative could discuss deliberations with any member of the jury, provided the juror(s) consented and the discussion occurred at a reasonable time and place. The record strongly suggests jurors would have been available to counsel immediately after they were dismissed, as the trial court asked them to return to the jury room for a few minutes.  Moreover, defense counsel offered no explanation for why he waited until after his vacation to give instructions to his investigator; why it took her so long to obtain the information she did; and why counsel could not present more detailed information with respect to whether jurors discussed their alleged misunderstanding of the trial court's instructions on aiding and abetting, and the nature of what the jury foreperson distributed to other jurors. [Citations.]

(Ex. A at *43.)

The appellate court also found that the trial court was reasonable to conclude that a

continuance would not have been useful because the "jurors' purported misunderstanding of the

court's instructions concerning aiding and abetting [counsel's basis for presenting a motion for a

new trial] could not furnish grounds for a new trial."  The court further found "[c]onsidering

strictly jurors' alleged misapprehension of the law, there was no suggestion in the present case

that jurors discussed improper subjects, or introduced extraneous law or facts into deliberations,

such that their statements themselves might be found to constitute misconduct."  Petitioner has

failed to cite (nor is this Court aware) of any Supreme Court precedent which holds that it would

be an abuse of discretion to deny a request for a continuance based on the fact that Petitioner

sought to interview jurors to determine if there was a basis to argue juror misconduct during the

deliberation process.  The Supreme Court has held that "broad discretion must be granted trial

courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon

expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of

counsel." <u>Morris v. Slappy</u>, 461 U.S. 1, 11-12 (1983). Thus, Petitioner has not shown the court's denial of his motion for a continuance violated his due process rights, and habeas corpus relief is foreclosed. <u>Id.</u>

X.   <u>Cumulative Prejudice</u>

Petitioner claims the cumulative effect of the errors during his trial denied his constitutional rights to due process and fundamental fairness. The California Court of Appeal denied the claim in the last reasoned decision stating:

> The few errors that may have occurred during [appellant's] trial were harmless when considered individually or collectively. [Appellant] was entitled to a fair trial, not a perfect one. [Citation.]" (*People v. Box*, *supra*, 23 Cal.4th at p. 1214.) As appellant's trial was fair, his contention fails.

(Ex. A at 44-45.)

This Court has either rejected Petitioner's claims and/or found that any errors, assumed or not, were not prejudicial. Viewed cumulatively, there was no violation of Petitioner's due process rights nor was any ruling contrary to, or an unreasonable application of, clearly established federal law, nor was any ruling based on an unreasonable determination of the facts in light of the evidence presented to the trial court. <u>See</u> 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000); <u>Holmes v. South Carolina</u>, 547 U.S. 319, 325-326 (2006). Accordingly, Petitioner's claim on this particular ground should be denied.

XI.   <u>Ineffective Assistance of Counsel</u>

Petitioner argues trial counsel was ineffective because his multiple sclerosis prevented him from reading and considering a questionnaire where the juror claimed to have had a family member murdered.

A.   <u>State Court Proceedings</u>

Petitioner raised this claim by way of habeas corpus petition and the Superior Court denied the claim as untimely stating:

> Petitioner failed to raise the issue raised in his writ in a timely manner. There is no statute of limitations for raising a habeas claim. Rather, a claim should be asserted in a habeas corpus petition "as promptly as the circumstances allow." (*In re Clark* (1993) 5 Cal.4th 750, 765 n.5.) Generally, a court will not consider an issue on habeas review if the claim was not raised in a timely manner. (*Clark*, supra.) Delay is measured from the time the petitioner knew, or

45

1  reasonably should have known, of the information offered in support of the claim and the legal basis for the claim.  (*In re Robbins* (1998) 18 Cal.4th 770, 780.)  A
2  court will not consider the merits of a delayed petition unless the petitioner provides an adequate justification for his failure to raise the claims in a timely
3  filed petition, or demonstrates that a fundamental miscarriage of justice occurred as a result of the proceedings leading to the conviction or sentence.  (*Clark*, 5
4  Cal.4th at pp. 797-798.)

5  Petitioner was sentenced on August 30, 2005[.  It] has been almost four years since that time and now at this late date the petitioner files additional claims.
6  The petitioner was clearly aware of the claims being made in his writ at an early stage of the proceedings yet he waits four years to raise them.  The petitioner has
7  raised no reasonable explanation for the delay.

8  (Ex. B at 2.)

9  The Superior Court later pointed out that at the time of the alleged ineffectiveness
10  Petitioner was represented by a different attorney, Mr. Cross, and Petitioner still failed to raise
11  this claim through Mr. Cross:

12  Petitioner submitted a declaration from Mr. Cross which now claims he
13  believed Mr. Girardot was providing ineffective assistance of counsel yet he did not raise this issue during the trial or during a motion for a new trial.  An attorney
14  has a fiduciary duty to the legal profession and to his client to let the court know if, in their opinion, their client is being inadequately represented by co-counsel.
15  Mr. Cross did not raise that issue during trial or in their new trial motion.  Even during the discussion of a continuance for further investigation for purposes of
16  running a new trial motion Mr. Cross never raised the issue of Mr. Girardot's incompetence.

17  An attorney cannot wait until the outcome of the trial is determined th[e]n
18  decide to raise the issue of ineffective assistance of counsel.  Mr. Cross states he noticed the problem but was too far away from Mr. Girardot to correct or remedy
19  the problem.  Mr. Cross, if he indeed felt that Mr. Girardot was hurting his client, should have moved to correct the problem.

20
21  (Ex. B at 3.)

22  In the alternative, the Superior Court denied the claim on the merits stating:

23  Regarding the ineffective assistance of counsel claim, the petitioner has
24  failed to establish the basic requirements for success on that claim.  A defendant is entitled to a new trial if he received ineffective assistance of counsel at trial.
25  (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1036.)  "Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1)
26  counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient
27  representation prejudiced the defendant, i.e., there is a "reasonable probability" that, but for counsel's failings, defendant would have obtained a more favorable
28  result.  The court in *People v. Dennis* (1998) 17 Cal.4th 468, 540-541 stated: "Our review is deferential; we make every effort to avoid distorting effects of hindsight

46

1    and to evaluate counsel's conduct from counsel's perspective at the time.  A court
2    must indulge a strong presumption that counsel's acts were within the wide range
     of reasonable professional assistance.

3         Petitioner claims Attorney Steven Girardot was ineffective because, as a
4    result of multiple sclerosis, he failed to read and consider a questionnaire wherein
     the juror claimed to have had a family member murdered.  A reading of the rest of
     the questionnaire and the outcome of the trial do not support the petitioner's claim
5    that a different outcome would have come about had Mr. Girardot conducted
     further inquiry into the background of the juror.

6         Mr. Girardot also submitted a declaration which establishes that he was, in
7    fact, suffering health issues during the trial but that he was completely focused
     and did not provide ineffective assistance of counsel.

8

9    (Ex. B at 2.)

10        B.    Exhaustion of State Court Remedies

11        Respondent argues this claim is barred because it is procedurally defaulted.  The Court

12   agrees.  The Supreme Court has addressed the failure to exhaust may lead to the bar of

13   procedural default stating:

14        We recognized the inseparability of the exhaustion rule and the
     procedural-default doctrine in *Coleman* [*v. Thompson*, 501 U.S. 722 (1991)]: "In
15   the absence of the independent and adequate state ground doctrine in federal
     habeas, habeas petitioners would be able to avoid the exhaustion requirement by
16   defaulting their federal claims in state court.  The independent and adequate state
     ground doctrine ensures that the States' interest in correcting their own mistakes is
17   respected in all federal habeas cases."  501 U.S., at 732 [].  We again considered
     the interplay between exhaustion and procedural default last term in *O'Sullivan v.*
18   *Boerckel*, 526 U.S. 838 [] (1999), concluding that the latter doctrine was
     necessary to "'protect the integrity' of the federal exhaustion rule."  *Id.*, at 848 []
19   (quoting id., at 853 [] (STEVENS, J., dissenting)).  The purposes of the
     exhaustion requirement, we said, would be utterly defeated if the prisoner were
20   able to obtain federal habeas review simply by "'letting the time run'" so that state
     remedies were no longer available.  *Id.* at 848 [].  Those purposes would be no
21   less frustrated were we to allow federal review to a prisoner who had presented
     his claim to the state court, but in such a manner that the state court could not,
22   consistent with its own procedural rules, have entertained it.  In such
     circumstances, though the prisoner would have "concededly exhausted his state
23   remedies," it could hardly be said that, as comity and federalism require, the State
     had been given "fair 'opportunity to pass upon [his claims].'"  *Id.* at 854 []
24   (STEVENS, J., dissenting) [] (quoting *Darr v. Burford*, 339 U.S. 200, 204 []
     (1950).

25
     *Edwards v. Carpenter*, 529 U.S. 446, 452-453 (2000) (italics omitted).
26
          The Superior Court found this claim procedurally barred because Petitioner delayed four
27
     years before presenting it.  The delay occurred despite the fact that Petitioner was represented by
28

                                            47

1   Mr. Cross at the time of the alleged ineffectiveness by attorney Girardot, yet Petitioner failed to

2   raise the claim promptly through attorney Cross.  Because the Superior Court's decision was the

3   last reasoned decision, this claim is procedurally barred and relief is precluded in this Court.

4   Edwards, 529 U.S. at 452-453.  In any event, the claim fails on the merits.

5       C.      Merits of Claim

6       Petitioner has failed to demonstrate that the Superior Court's ruling was unreasonable as

7   he has made no showing of prejudice from the fact that attorney Girardot suffered from multiple

8   sclerosis.  The lack of such prejudice is fatal to Petitioner's ineffectiveness claim.

9       Furthermore, Petitioner's claim is based on the fact that because attorney Girardot

10  suffered from multiple sclerosis any act or omission by him could be deemed deficient

11  performance by mere virtue of the fact he suffered from such condition.  Such conclusion cannot

12  be logical because nothing about the fact of Mr. Girardot's medical condition would support the

13  view that his presumptively valid acts or omissions should be treated differently from any other

14  reasonable attorney.  Accordingly, habeas corpus relief is foreclosed.

15  XII.    Juror Information

16      Petitioner contends that one of the juror's failed to disclose a criminal act against his

17  brother and brother's 5 year old daughter in 2001.

18      In the last reasoned decision, the Superior Court denied the claim stating, "At the end of

19  the juror's statement regarding that incident he states 'Nothing happened to them.'  Nothing that

20  the petitioner raises indicates that the decision of the juror was influenced by that 2001 incident."

21  (Ex. B at 3.)

22      "In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . .

23  trial  . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391

24  U.S. 145 (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the

25  misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United

26  States v. Klee, 494 F.2d 394, 396 (9th Cir.), cert. denied, 419 U.S. 835 (1974).  A prospective

27  juror must be removed for cause if his views would prevent or substantially impair the

28  performance of his duties as a juror.  Wainwright v. Witt, 469 U.S. 412, 424 (1985) (judge may

strike for cause a potential juror whose views regarding the death penalty "would prevent or substantially impair the performance of his duties as a juror."). If a juror has developed a deep and strong impression that they will not listen to testimony with an open mind, a challenge may be raised.

To succeed on a claim that a juror's failure to disclose information during voir dire, a "party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equipment, Inc. V. Greenwood, 464 U.S. 548, 556 (1984). If "an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).

In this instance, any allegation of juror misconduct is speculative. Petitioner's argument requires the court to speculate that juror D. Peterson misrepresented something in voir dire and to further speculate that the jury was somehow improperly influenced by the alleged misrepresentation. Speculative allegations are an insufficient showing of a challenge for cause. Moreover, there is no Supreme Court precedent that "squarely established" a "specific rule," that a criminal defendant is entitled to know particular facts about a prospective juror to determine for himself whether this juror will be as fair as declared to be. Thus, Petitioner is not entitled to relief on this claim.

XIII.   Presence of Witness During Examination of Another Witness

Petitioner contends the presence of witness, Domingo Flores, during examination of another witness violated his constitutional rights.

The Superior Court issued the last reasoned decision initially finding the claim to be untimely and, in the alternative, found the claim to be without merit stating:

> The presence of the witness in the courtroom was raised during the testimony of the witness in question. No objection was made at the time and the petitioner cannot now come before the court and claim he was injured by that presence of the witness. The credibility of the witness was attacked in front of the jury and they had the opportunity to determine whether he was telling the truth or not.

1   (Ex. B at 3-4.)

2        Petitioner has not demonstrated, by clear and convincing evidence, that the Superior

3   Court was factually incorrect by finding that the doubly-counseled Petitioner failed to object to

4   the witnesses presence during testimony.  The state court's finding is binding on this Court.  28

5   U.S.C. § 2254(e)(1).  Thus, it was not unreasonable for the Superior Court to find no

6   constitutional violation by the failure of the trial court to sua sponte remove the witness from the

7   courtroom.  See e.g. Estelle v. Williams, 425 U.S. at 507 ("the failure to make an objection to the

8   court . . ., for whatever reason, is sufficient to negate the presence of compulsion necessary to

9   establish a constitutional violation.).

10

11        Petitioner has not exhausted a claim that counsel's election not to object to the witness's

12  presence constituted ineffective assistance of counsel.  To the extent Petitioner is attempting to

13  argue the trial judge should have foreclosed counsel's election, such that there was a sua sponte

14  duty to proceed differently, the claim is without merit.  The state court reasonably found

15  counsel's

16  election was binding on Petitioner, and the substance of the claim is not changed by rephrasing it

17  as a complaint against the judge.  The Supreme Court has stated:

18        Although there are basic rights that the attorney cannot waive the fully informed
          and publicly acknowledged consent of the client, the lawyer has – and must have
19        – full authority to manage the conduct of the trial. [Citation.] As to many
          decisions pertaining to the conduct of the trial, the defendant is "deemed bound by
20        the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of
          which can be charged upon the attorney.'" [Citation.] Thus, decisions by counsel
21        are generally given effect as to what arguments to pursue, [citation], what
          evidentiary objections to raise, [citation], and what agreements to conclude
22        regarding the admission of evidence, [citation].  Absent a demonstration of
          ineffectiveness, counsel's word on such matters is the last.
23

24  New York v. Hill, 528 U.S. 110, 114-115 (2000); see also Allum v. Twomey, 484 F.2d 740, 744-

25  745 (9th Cir. 1973) ("assuming the lawyer's competence, the client must accept the

26  consequences of his trial strategy").

27  XIV.   Certificate of Appealability

28        A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

                                              50

1   district court's denial of his petition, and an appeal is only allowed in certain circumstances.

2   Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

3   whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

4           (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
        district judge, the final order shall be subject to review, on appeal, by the court
5       of appeals for the circuit in which the proceeding is held.

6           (b) There shall be no right of appeal from a final order in a proceeding to test the
        validity of a warrant to remove to another district or place for commitment or trial
7       a person charged with a criminal offense against the United States, or to test the
        validity of such person's detention pending removal proceedings.
8
        (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an
9               appeal may not be taken to the court of appeals from–

10              (A) the final order in a habeas corpus proceeding in which the
                detention complained of arises out of process issued by a State
11              court; or

12              (B) the final order in a proceeding under section 2255.

13              (2) A certificate of appealability may issue under paragraph (1) only if the
            applicant has made a substantial showing of the denial of a constitutional right.
14
                (3) The certificate of appealability under paragraph (1) shall indicate which
15          specific issue or issues satisfy the showing required by paragraph (2).

16          If a court denies a petitioner's petition, the court may only issue a certificate of

17   appealability "if jurists of reason could disagree with the district court's resolution of his

18   constitutional claims or that jurists could conclude the issues presented are adequate to deserve

19   encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473,

20   484 (2000).  While the petitioner is not required to prove the merits of his case, he must

21   demonstrate "something more than the absence of frivolity or the existence of mere good faith on

22   his . . . part." Miller-El, 537 U.S. at 338.

23          In the present case, the Court finds that reasonable jurists would not find the Court's

24   determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or

25   deserving of encouragement to proceed further.  Petitioner has not made the required substantial

26   showing of the denial of a constitutional right.  Accordingly, the Court hereby DENIES

27   Petitioner's motion for certificate of appealability.

28

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The instant petition for writ of habeas corpus is DENIED;

2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and

3.      The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:    February 1, 2012**                    _____/s/ **Barbara A. McAuliffe**_____
                                        UNITED STATES MAGISTRATE JUDGE